SLIP OPINION

Cite as 2017 Ark. App. 614

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-17-622

LAURA MEYERS

APPELLANT

V.

ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD

APPELLEES

**OPINION DELIVERED:** NOVEMBER 15, 2017

APPEAL FROM THE OUACHITA COUNTY CIRCUIT COURT
[NO. 52JV-17-11]

HONORABLE DAVID W. TALLEY, JR., JUDGE

REVERSED AND REMANDED

## ROBERT J. GLADWIN, Judge

The Ouachita County Circuit Court granted permanent custody of the minor child, D.D., born June 23, 2014, to Bobby Delee, her father, and closed the dependency-neglect case that appellee Arkansas Department of Human Services (ADHS) had brought against D.D.'s mother, appellant Laura Meyers. Meyers argues on appeal that the trial court erred because she did not receive notice that permanent custody and a no-reunification-of-services request would be considered at the scheduled adjudication hearing. She also argues that the trial court's order is void because the trial court failed to find that the child had been adjudicated dependent-neglected and that the trial court erred because it failed to follow the required provisions of the juvenile code. Appellees ADHS and the attorney ad litem contend that this court should affirm the trial court's oral finding of dependency-neglect, enter the finding of dependency-neglect in writing, and affirm the child's placement with her father. Appellees also argue that we should reverse and remand the trial court's decision to close the case and not order reunification services because Meyers did not receive the

SLIP OPINION

required statutory notice before the case was closed. We reverse the trial court's order granting permanent custody to Delee, closing the case, and ordering no reunification services because Meyers did not receive the required statutory notice. We remand for further proceedings consistent with this opinion.

## I. *Facts and Procedural History*

ADHS filed a petition for emergency custody and dependency-neglect on February 13, 2017, and an ex parte order granting ADHS custody was filed on the same day. The petition alleged that D.D. was dependent-neglected based on parental unfitness. The attached affidavit of Bridgette Patterson, a family service worker (FSW) for ADHS, states that a report was received that D.D., who lived with Meyers, was covered from head to toe in roach bites. Patterson completed a health-and-safety assessment on January 31, 2017, and observed that the house was infested with roaches, two dogs were in the house and had left feces on the floor, the home was cluttered with clothes, and the sink was full of dirty dishes. Patterson also saw bites on the child's legs, arms, stomach, and back, and Meyers had not sought medical care for the child. Meyers told Patterson that she had been diagnosed with schizophrenia, ADHD, bipolar disorder, and a "split personality," but Meyers said that she did not take medication and had not been to a doctor or counselor for these issues. The affidavit described two prior agency involvements, one in Georgia, which was found to be unsubstantiated, and another in Arkansas on September 9, 2016, when Meyers took D.D. to Ouachita Valley Clinic where it was discovered that the two-year-old was behind on her vaccinations and was covered in a rash, thought to be scabies. Meyers told the clinic worker that D.D. had cockroach bites, and Meyers was covered in bites as well. Meyers told the

clinic that she has three other children, two of whom were in their dad's custody because she had tried to kill him. The other child, who was born with a birth defect, had been placed for adoption. Meyers was told about services for D.D., such as speech and physical therapy, but Meyers said that she did not trust doctors and did not want anyone to come into her home. These allegations were found to be true, a protective-services case was opened, and ADHS attempted to provide services from October 2016 until January 2017, when Patterson conducted the health-and-safety check.

Following the entry of the emergency order, Meyers was appointed counsel, and on March 21, 2017, the trial court signed an order for compliance with Regulation 7 of the Interstate Compact on the Placement of Children (ICPC) to request a home-study assessment on Delee because he lived in Tennessee. On March 22, 2017, a probable-cause order was filed wherein the trial court found that the emergency conditions that caused removal continued and it was necessary that D.D. remain in ADHS custody. ADHS was ordered to develop an appropriate case plan for the child and family and to provide services as appropriate to achieve the goal of the case plan. The trial court found that Meyers had agreed to start counseling and complete her psychological evaluation before the adjudication hearing and ordered her to do so. An adjudication hearing was set for March 15, 2017; however, the hearing was continued until April 19, 2017.

Both parents attended the adjudication hearing with their counsel, and Patterson testified to the allegations set forth in the affidavit attached to ADHS's original petition. Photographs of Meyers's home taken during Patterson's January 31, 2017 visit were admitted in evidence. On cross-examination, Meyers's counsel asked Patterson what efforts

SLIP OPINION

were made to prevent having to remove the child from Meyers's custody. The following colloquy occurred:

| | |
|---|---|
| ADHS COUNSEL: | That's not relevant to the finding of dependency-neglect. |
| MEYERS'S COUNSEL: | Are you not asking for a finding of dependency-neglect today? |
| ADHS COUNSEL: | That's a different finding. |
| MEYERS'S COUNSEL: | Are we going to have another hearing on it? |
| ADHS COUNSEL: | That's a part of the disposition finding. |
| MEYERS'S COUNSEL: | But the court's not going to make that finding today, so I'll reserve those questions. That's all I have, Your Honor. |

Patterson was then questioned by the attorney ad litem representing D.D. At the conclusion of Patterson's testimony, the following colloquy occurred:

| | |
|---|---|
| MEYERS'S COUNSEL: | I just want to be clear on one issue. The Department today is not asking for a reasonable-efforts finding? |
| THE COURT: | I think that what they are doing is, they're getting to this threshold and then we move into disposition. That's the point where we talk about reasonable efforts. |
| ADHS COUNSEL: | Correct. |
| MEYERS'S COUNSEL: | To prevent removal? |
| ADHS COUNSEL: | Right. |
| MEYERS'S COUNSEL: | Okay. |

Meyers testified that she has children other than D.D. and that she had spent time in jail as a result of causing one child to have a broken tibia. She also said that she recalled

stating in her psychological evaluation that she had tried to kill the father of two of her

children. She said that

> [a]fter many years of physical, verbal, psychological, and mental abuse, one day I just snapped on him. He kicked me in my back and the last thing I remember is the cops being at the house. From what they told me, they said I snatched him by the throat and that if he hadn't hit me in my ribs, he would have been dead. So, I personally don't have any recollection of it. I only have what I was told.
>
> I couldn't even tell you where my children were at the time. When I blacked out, I had no clue where they were at. That doesn't happen frequently for me. It took nine years to happen once. I've been diagnosed with schizophrenia for as long as I can remember. If I can remember that far back, yeah, since I was a child. I stopped taking my meds for that diagnosis nine years ago.
>
> I've been diagnosed with bipolar for the same amount of time. What happened in my childhood brought out a lot of unstable things and they had me on medications and I was taking the medications, but I was blacking out repeatedly. My body was not accepting the medications and I quit taking them. When I quit taking them, I stopped blacking out.
>
> The child's fractured limb didn't happen during a blackout. That happened because me and my child's father had gotten into an argument and [the child] was crying and I laid him down on the bed and I didn't realize his leg was trapped up underneath him and when I put him down, it fractured his tibia.

On cross-examination by ADHS, Meyers admitted that the house had roaches and

explained that she had tried to deal with them and had argued with her landlord about it

for almost two years. She said that D.D.'s bites came from roaches, but she also said that

they had gone camping and that D.D. had "mosquito bites and whatnot."

On cross-examination by the attorney ad litem, Meyers said that her first child had

the broken tibia and now lives with his father. She said that this same man, who is also the

father of her next two children, was the man she had tried to kill. She said that their third

child was placed for adoption "because she was missing the right front part of her brain."

She said that the child had first been placed in foster care at her request because her son had

a violent tendency and she did not want him to beat the child. She said that her other two children had been in foster care because of the bad relationship she had with their father. She said that all of this had happened while she was living in New Jersey. She said that she then lived in Georgia for a time when she was with D.D.'s father. She said that child-protective services (CPS) in Georgia had been told that she had been sleeping with a hunting knife underneath her pillow. She said that it was not true and that CPS could not prove it. She also said that she had been told that she has five personalities. She stated,

> Lucky you're just talking to me now. Just Laura Meyers. Yesterday was the day that they just all came out and I was snappy and whatnot, but my mom knows how to deal with it and she talks me out of it, so. It's not like I got violent or anything. I was just real, how do you say, annoyed?

The trial court questioned Meyers, and she said that she had lived in Arkansas for the last three years. When the trial court asked her the name of D.D.'s doctor, she admitted that she had not taken her child to see a doctor.

Renee Yancy was called as a witness by the attorney ad litem, and she testified that she worked for ADHS and that she had photographed D.D.'s bites with her cell phone on January 31, 2017, and the pictures were printed and introduced as evidence. The trial court then announced that it was making a finding of dependency-neglect. The trial court asked, "Do you have anything concerning disposition?" The following colloquy occurred:

| | |
|---|---|
| MEYERS'S COUNSEL: | You Honor, I believe that would be more appropriate for the disposition hearing. |
| THE COURT: | That's where we are. |
| MEYERS'S COUNSEL: | I thought we were going to have the disposition in a couple of weeks. |
| THE COURT: | No. We're having it right now. |

| | |
|---|---|
| MEYERS'S COUNSEL: | It was my understanding that we would have that in a couple of weeks. |
| THE COURT: | Wait a second, because it's rare that we have them on a different day than a finding. |
| ADHS COUNSEL: | Let me explain. I had talked to him, because of the father. We have done an ICPC on Mr. Delee. |
| THE COURT: | Okay. |
| ADHS COUNSEL: | Before he went to talk to his client for the hearing, I had told him that that was what I was going to ask to do, then while he was talking to Ms. Meyers, I found out that Mr. Laney and Mr. Delee were actually here, because I was under the impression that Mr. Delee wasn't coming. When they walked in the courtroom, I found out that they want to make a pitch to the court for custody today. |
| THE COURT: | All right. Do you need another recess, [Meyers's Counsel], which is not a problem? |
| MEYERS'S COUNSEL: | No. I believe we can proceed. |

ADHS offered Meyers's psychological evaluation as an exhibit, and it was admitted without objection.

ADHS then called Shanell Robbins, supervisor for Ouachita County Department of Child and Family Services (DCFS), who testified that ADHS had a protective-services case open on Meyers in late October 2016. She said that a protective-services case generally comes from an investigation, and if the investigation is substantiated, DCFS would provide services to the family to prevent removal and maintain the children in the home. She said that the services offered between October and January were worker visits, attempts to offer homemaker services, and a referral for an assessment for "Kids First, First Step for D.D. in an effort to prevent the removal of this child." She said that the assessment was never done

and that DCFS did not have a lot of contact with Meyers during that time period.  Robbins said that in September 2016, the home was in the same condition as depicted in the pictures of the home on January 31, 2017.  Robbins said that ADHS recommended that the goal be relative placement with the father.  She said that ADHS was not recommending reunification due to recommendations in Meyers's psychological evaluation, Meyers's statement that she would not take any type of medication to manage her mental disabilities, and the history of Meyers's poor home environment.

On cross-examination, Robbins testified that she had visited the home on September 9 and 11, 2016, and the home had been infested with insects, had feces in the front area, and was cluttered.  Services were put in place with Meyers and her landlord that prevented the removal of the child at that time.  The landlord agreed to have the home treated for insects.  Meyers and her mother agreed to clean the home.  Meyers also agreed to allow the child to stay with a friend while the home was cleaned and treated for insects.  During the investigation, Robbins visited the home several times.  She said that Meyers had taken things out of the home, had put the dogs outside in a kennel at one point, and had thrown away furniture and bags of clothes in an attempt to rectify the situation.  Meyers and her mother were to split the cost of an exterminator every month, but she did not follow through with that.  Robbins said that the landlord agreed to have the home sprayed one time, and he said he had gone over with Meyers the need to keep the home clean and the animals out to prevent infestation.  Robbins said that when the child was removed, ADHS did not try any of those services again.

Counsel for ADHS asked the court for a finding that Delee had no role in the cause of dependency-neglect and stated that there was no evidence that he had been living in the home at any time since September 2016. Counsel stated that the ICPC had been done, and ADHS had received a letter from Tennessee reflecting that it would be approved. However, ADHS asked the trial court to reserve the issue because the official approval had not been returned and to note that ADHS could not agree to custody and placement at that time.

Meyers testified that she had cooperated with ADHS when they first became involved and that she cleaned the house and "bombed as much as we could." She said that her mother lived on the other side of their duplex, and both sides were sprayed and baited. She said that she would take any assistance provided to obtain other housing. She said that she had cooperated with services because she went to counseling and had been making a lot of progress with her therapist. She said that she had not been to the psychiatrist because she had to go to a "regular doctor appointment" first. She said that she was willing to go to parenting classes and that she had asked ADHS about getting HUD or Section 8 housing, but she had not received any assistance. She said that the only concern she had about placing D.D. in Delee's custody was that Delee told her four or five years ago that he had been accused of "messing with a minor." She also complained that he did not pay child support.

On cross-examination, Meyers said that she had told ADHS in September 2016 that she could not get into housing because she had a criminal record. She also said that she had a criminal record for "B. and E. and whatnot" and that she had charges for "when the child had a broken tibia." She said that she was willing to take a mood stabilizer, that she had been on medications when she tried to kill her husband, and that she had been on

medication when she accidently broke her child's tibia. She agreed that it was a lose–lose situation because there was no reason to think that if she went back on medications, her problems would be fixed. She said that violence is an issue with only one of her five personalities but

> not Laura Meyers's, that's for sure. I know that because I only black out when a certain one comes out. That's number five. I don't know what number five's name is. As far as I'm concerned, they're just numbers and I don't let it get that far.

> When number five comes out, that's when the violence happens, but it takes a lot to make that one to come out. It really does. It took nine years for my first kids' father to push it that far. I had never seen that one until then. The other four are grumpy, cranky, and depressing. They're not violent. They're just negative. All of them are negative, pretty much.

The attorney ad litem introduced an email from the Tennessee DCFS indicating that Delee's home study had been completed, and his home had been recommended for placement.

Delee testified that he lives in Tennessee and had for two years. He said that he works for a car manufacturer and had been employed there since January. Before that, he had worked as a truck driver but had lost his job because he had diabetes and was prescribed insulin. During the time he was off work, his girlfriend had supported him. He said that he lived with his girlfriend and her mother, son, and two daughters. He said that he was ordered to pay child support for D.D. by a Georgia court and that he had joint custody of her. The Georgia order granting joint custody was admitted in evidence along with photographs of Delee's home in Tennessee. Delee said that he had passed the drug test and the background check, that his home met all the qualifications, and that he was ready to take custody of his daughter. He said that he had checked into schools and that D.D. would be enrolling with Head Start, which begins at age three. He said that he planned to use the

primary-care physician that his girlfriend uses for her daughters and that he had checked with the Sweetwater primary school system about programs they offered to address D.D.'s speech and language impediments. He said that he did not object to Meyers's visiting under supervised conditions, and he asked for custody to be placed with him that day. On cross-examination, he admitted that he was behind on his child support because he had previously been out of work for almost a year.

After Delee's testimony, ADHS asked the trial court for a finding of reasonable efforts. Also, ADHS asked that it be allowed to "come back on the home study and letter from Tennessee." ADHS asked for a finding that Delee did not have a role in the finding of dependency-neglect, for the goal to be relative placement with Delee, and that there be no reunifications services to Meyers based on her testimony and the information provided in the psychological evaluation. ADHS argued that there was no reason to believe that providing Meyers with counseling and medication services "would get us anywhere in this case."

The attorney ad litem agreed with ADHS's request for a reasonable-efforts finding and for "no reunification services." The ad litem argued that there were no services that could be provided, even medication, that would help. She asked that the child be placed with Delee that day because the letter from Tennessee said he was approved, and the home study, although it had not worked its way through the bureaucracy, was on its way and had been approved. She said that Delee was a joint custodian.

The trial court asked ADHS counsel what he thought about the request for the child to go with Delee that day. ADHS stated that it could not agree because it had not received

the approved home study, but if the trial court did make that finding, ADHS would ask that it be permanent custody and that the case be closed. ADHS said that "technically, it's a violation of the ICPC if the court doesn't have one."

Meyers's counsel argued that Meyers had a constitutional right as a parent to services provided by ADHS. Counsel argued that there was a constitutional due-process right involved. He claimed that Meyers did not receive any notice, and there were no motions filed that stated ADHS was seeking to terminate reunification services. He claimed that once ADHS made the decision to remove the child, it had a duty to provide services. He argued that ADHS had a duty to try for reunification and that they had a case plan that was generic and not individualized for the serious issues here.[1] He argued that Meyers could benefit from intensive counseling, as suggested by the psychological evaluation, and that she should not lose custody permanently until those services were provided.

ADHS argued that there was no statutory or case law that required it to provide notice unless the goal of the case was changed from reunification. ADHS argued that the goal should be placement with the father after the expected approved ICPC home study.

In its ruling from the bench, the trial court summarized the testimony and the conditions that led to the child's removal from her mother. It noted the condition in the home, the pictures of the bites on the child, and the neglect by Meyers in not seeking treatment for her child. It noted that Meyers's testimony was not consistent with her child's broken leg and said that a broken leg cannot be caused by "simply placing the child on the

---

[1]The trial court noted that there was not a case plan, and Meyers's counsel said he had seen a draft.

bed." The trial court also noted Meyers's inconsistent testimony regarding the blackouts and what caused them. The trial court considered that Delee had been given joint custody by a court order. The trial court found that ADHS made reasonable efforts to avoid "this situation" by recommendations made in the fall of 2016, and it was Meyers's failure to follow through that led to the removal of the child in January 2017. The trial court found that it was in the child's best interest that custody be placed with Delee and that, regardless of potential services, and even if reunification was one of the concurrent goals, reunification could not have been accomplished within a year. "I'm not going to leave this child in foster care for six months or a year, when there is an appropriate placement for her with a parent." The trial court ordered supervised visitation at Delee's discretion and stated that Meyers could file a petition for a change in visitation or a change in custody if circumstances warranted it. The trial court's order, filed April 24, 2017, did not contain the trial court's adjudication of dependency-neglect. Meyers filed a timely notice of appeal, and this appeal followed.

## II. *Standard of Review*

We review dependency-neglect cases under the following legal guidelines:

> Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Dependency-neglect allegations must be proven by a preponderance of the evidence. We will not reverse the circuit court's findings unless they are clearly erroneous. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. The focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected. An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. The appellate court is not to act as a "super factfinder," substituting its own judgment or second guessing the

credibility determinations of the court; we reverse only in those cases where a definite mistake has occurred.

*Bean v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 350, at 4–5, 498 S.W.3d 315, 318

(citations omitted).

### III.  *Statutory Notice*

Arkansas Code Annotated section 9-27-365 (Repl. 2015) provides that a motion for

no reunification services must be provided to all parties in writing at least twenty days before

a scheduled hearing.  Ark. Code Ann. § 9-27-365(a)(1)(A)–(B).  Meyers argues that it was

error for the trial court to grant permanent custody to Delee and close the case.  She claims

that she did not get notice that ADHS was going to ask that it not be required to provide

reunification services and instead request permanent placement of D.D. with her father,

Delee, and she contends that the lack of notice violated her "basic constitutional rights."

She cites *Tuck v. Arkansas Department of Human Services*, 103 Ark. App. 263, 288 S.W.3d

665 (2008), for the proposition that the State must provide parents with fundamentally fair

procedures when it "moves to destroy weakened familial bonds."  *Tuck* stated,

> We have said it so frequently that it is now axiomatic: few consequences of judicial action are so grave as the severance of natural family ties. *See Osborne v. Ark. Dep't of Human Servs.*, 98 Ark. App. 129, 252 S.W.3d 138 (2007). As long as there is reason to believe that positive, nurturing parent-child relationships exist, the law favors preservation, not severance, of natural familial bonds. *See Santosky v. Kramer*, 455 U.S. 745; *Benedict v. Ark. Dep't of Human Servs.*, 96 Ark. App. 395, 242 S.W.3d 305 (2006). Once a child has been adjudicated dependent-neglected, there is a presumption that DHS will provide services to preserve and strengthen the family unit. *Benedict*, *supra*. A parent's right to the care and control of his or her child is a fundamental liberty, and termination of parental rights is an extreme remedy in derogation of those rights. *See Jones v. Ark. Dep't of Human Servs.*, 361 Ark. 164, 205 S.W.3d 778 (2005). This fundamental liberty interest does not evaporate simply because the mother and father have not been model parents. *See Osborne*, *supra*. Even when blood relationships are strained, parents retain a vital interest in preventing the

irretrievable destruction of their family life. *Id.* If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting State intervention into ongoing family affairs. *Id.*

Accordingly, when the State moves to destroy weakened familial bonds, it must provide parents with fundamentally fair procedures. *See id.*

*Tuck*, 103 Ark. App. at 266–67, 288 S.W.3d at 667–68.

Meyers cites *Hardy v. Arkansas Department of Human Services*, 2009 Ark. App. 751, 351 S.W.3d 182, where this court remanded for the parties to comply with the requirements for no-reunification-services hearings.[2] *See also Henson v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 225, 434 S.W.3d 371 (motion for no reunification services filed prior to adjudication); *Phillips v. Ark. Dep't of Human Servs.*, 85 Ark. App. 450, 158 S.W.3d 691 (2004) (ADHS announced its intent to file a no-reunification-services motion).

Appellees concede that it was reversible error for the trial court to close the case without reunification services because Meyers did not receive the statutory notice required. Ark. Code Ann. § 9-27-365(a)(1); *Hardy, supra.* Therefore, appellees request that this court reverse the trial court's decision to close the case and not order reunification services and remand the case for further proceedings, including the consideration of any motions to terminate reunifications services to Meyers under section 9-27-365.

We agree with the appellants' and appellees' contention that reversible error occurred because Meyers did not receive the required statutory notice. Accordingly, we reverse the

---

[2]*Hardy* interpreted Ark. Code Ann. § 9-27-329 (Repl. 2008), which has since been amended, and the requirement of notice for no reunification services is now codified at Ark. Code Ann. § 9-27-365 (providing that any party may file a motion for no reunification services at any time and the motion should be provided at least twenty days before a scheduled hearing).



trial court's order closing the case without reunification services and remand for proper notice under Arkansas law.

### IV. *Adjudication*

Meyers argues that the trial court's disposition order is void because it does not reflect the trial court's ruling that the child was dependent-neglected.  Meyers contends that an oral finding does not satisfy the requirement under the code that a disposition order may only be entered when a child is found to be dependent-neglected.  *See* Ark. Code Ann. § 9-27-334(a).  Further, Administrative Order No. 2 provides that an order announced from the bench is not effective until reduced to writing and filed of record.  Ark. Sup. Ct. Admin. Order. No. 2(b)(2) (2016); *see also* Ark. R. Civ. P. 58 (2016).  Therefore, Meyers argues that the trial court lacked the authority to grant permanent custody to Delee.

Appellees argue that this court should go to the record and affirm the trial court's dependency-neglect finding and enter that finding, which the trial court failed to include in its order.  They argue that a preponderance of the evidence supported the trial court's oral finding of dependency-neglect and that the trial court intended to make the required dependency-neglect finding.  They cite several cases for the proposition that this court can go to the record and enter the finding that the trial court should have entered.  *See Ingle v. Ark. Dep't of Human Servs.*, 2014 Ark. 53, at 9, 431 S.W.3d 303, 308; *Hanlin v. State*, 356 Ark. 516, 529, 157 S.W.3d 181, 189 (2004); *Haynes v. State*, 314 Ark. 354, 358, 862 S.W.2d 275, 277 (1993); *Ferguson v. Green*, 266 Ark. 556, 587 S.W.2d 18 (1979); *Fye v. Tubbs*, 240 Ark. 634, 401 S.W.2d 752 (1966); *Narisi v. Narisi*, 229 Ark. 1059, 320 S.W.2d 757 (1959).

Because we are reversing the trial court's order closing the case without reunification services, the trial court may include in its future orders any findings necessary for compliance with the applicable statute. We decline to amend the trial court's order and hold that the trial court may amend as its sees fit on remand.

## V. *Custody*

Meyers argues that the trial court, acting under the auspices of the juvenile code, modified custody without giving her notice that such a result was a possibility. *See Miller v. Ark. Dep't of Human Servs.*, 86 Ark. App. 172, 167 S.W.3d 153 (2004) (holding that there is a distinction in custody cases between those filed under the juvenile code and those filed pursuant to a change-of-custody petition). She cites *Clark v. Arkansas Department of Human Services*, 2016 Ark. App. 286, 493 S.W.3d 782, in which this court held that when ADHS requested a change of custody, the statutory guidelines and framework for such set forth in the juvenile code should have been applied. She also contends that *Nance v. Arkansas Department of Human Services*, 316 Ark. 43, 873 S.W.2d 721 (1994), holds that the circuit court must follow the juvenile code when making custody decisions under the juvenile code. She argues that there was no child-custody case here but a dependency-neglect petition. Meyers also complains that the trial court failed to adhere to the statutory requirement that mandates a home study before placing custody of a child with a relative, citing Arkansas Code Annotated section 9-27-335(d).

Appellees argue that Meyers did have notice that custody was going to be an issue because the dependency-neglect petition addressed custody and included a specific notice that the circuit court may not order reunification services and instead could proceed directly

to permanency for the juvenile.[3]  Further, appellees rely on the ICPC order for expedited consideration of Delee for custody and placement in Tennessee and the emergency-custody and probable-cause orders which continued D.D. out of Meyers's custody.  They argue that the entire framework of the code puts custody at issue at every stage of the proceeding.

Appellees also claim that there was evidence of Delee's fitness for custody, and placing custody with him should be affirmed.  Under Arkansas law, trial courts have the authority to transfer custody in a dependency-neglect proceeding if it is determined that the transfer is in the best interest of the juvenile involved, and if custody is transferred to a relative or other individual, a written home study is presented to the court.  Ark. Code Ann. § 9-27-334(a)(2).  Trial courts are also required to consider whether a noncustodial parent contributed to a juvenile's dependency-neglect and whether the parent is fit for custody or visitation.  Ark. Code Ann. § 9-27-327(a)(1)(B)(i).  If a custodian lives out of state, Arkansas law requires written approval by the appropriate public authorities in the custodian's home state in lieu of a written home study before a juvenile can be placed in the custodian's home pursuant to a court order.  Ark. Code Ann. § 9-29-201, art. III.

Appellees argue that the trial court found that transfer of custody to Delee was in D.D.'s best interest.  The trial court found that Delee had not contributed to D.D.'s dependency-neglect and that he is fit for custody.  The trial court had written evidence that the authorities in Tennessee had approved placement of D.D. into Delee's home by virtue

_____

[3]This is a reference to the notice at the end of the petition, following the attorney's signature on the pleading.  It concludes, "In some cases, the Court will determine that the Arkansas Department of Human Services is not required to provide reunification services and permit Arkansas Department of Human Services to proceed directly to permanency for the juvenile, Ark. Code Ann. § 9-27-303 [definitions]."

of the letter placed in evidence.  Appellees argue that a home study was not required for a parent who lives out of state and has written approval.

We reverse the trial court's order placing permanent custody with Delee because the order is premised on the trial court's premature closure of the dependency-neglect action. Without proper notification to Meyers, the trial court ordered that no reunification services were required and placed permanent custody with Delee against ADHS's arguments that doing so would be a violation of the ICPC.  We acknowledge the trial court's inclination to shortcut the proceedings when circumstances seem extreme; however, awarding permanent custody to Delee based on the framework of a change-of-custody petition is in derogation of the dependency-neglect statutes that control in this case.  Accordingly, we reverse the permanent-custody finding and remand for further proceedings in accordance with this opinion.

Reversed and remanded.

GLOVER and HIXSON, JJ., agree.

*Tina Bowers Lee*, Arkansas Public Defender Commission, for appellant.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by:  *Keith L. Chrestman*, attorney ad litem for minor child.