Cite as 2022 Ark. App. 124

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-21-506

| | |
|---|---|
| VENSON MASON<br><br>APPELLANT<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered March 9, 2022<br><br>APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT [NO. 15JV-19-72]<br><br>HONORABLE TERRY SULLIVAN, JUDGE<br><br>REVERSED AND REMANDED |

**KENNETH S. HIXSON, Judge**

Appellant Venson Mason appeals from the termination of his parental rights to his seven-year-old daughter, C.M.[1]  On appeal, Venson argues that the termination order should be reversed because there was insufficient evidence of statutory grounds and insufficient evidence that the termination was in C.M.'s best interest.  We hold that the trial court clearly erred in finding that termination of Venson's parental rights was in C.M.'s best interest.  Accordingly, we reverse the order terminating his parental rights, and we remand for further proceedings.

---

[1]C.M.'s mother, Christina Mason, never appeared in the case and passed away two months before the termination order was entered.

In order to terminate parental rights, the trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Supp. 2021). The order terminating parental rights must also be based on a showing by clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Best v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 485, 611 S.W.3d 690.

A trial court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

This case began on October 8, 2019, when appellee Arkansas Department of Human Services (DHS) filed a petition for emergency custody of C.M.  An attached affidavit stated that C.M. had lived with her father, Venson, since birth.  The affidavit stated that family-service workers visited the house where they were living and found inappropriate and dangerous circumstances.  The family service workers observed several individuals both inside and outside the house, and upon inquiry, Venson stated that he and C.M. slept on the couch.  The family service workers saw drug paraphernalia in the house.  When the police arrived, Venson threw drugs and drug paraphernalia out the bathroom window.  Venson told the family service workers that he smoked marijuana every day "like cigarettes" and admitted that he had used methamphetamine two days earlier.  Venson was drug screened and tested positive for methamphetamine, amphetamines, and THC.  C.M. told the family service workers that her father smoked "blunts and cigarettes."  C.M. further stated that when she gets in trouble, her father pulls her hair, and she pointed to a spot on her head where a patch of hair was thinner.  C.M. also showed the family service workers bites on her neck, which she said were from bed bugs.

On October 8, 2019, the trial court entered an ex parte order of emergency custody, and on October 9, the trial court entered a probable-cause order. The trial court entered an adjudication order on November 21, 2019, finding C.M. dependent-neglected due to parental unfitness, abuse, and environmental neglect.[2]  The goal of the case was reunification

---

[2]The trial court noted that C.M.'s mother did not contribute to the dependency-neglect and that her whereabouts were unknown.

with the concurrent goal of guardianship or adoption. In the adjudication order, Venson was ordered to remain drug-free and submit to random drug screens, complete parenting classes, maintain safe and stable housing, maintain stable employment, and cooperate with DHS.

The trial court entered a review order on March 18, 2020. In the review order, the trial court found that Venson was partially compliant with the case plan. The trial court found that Venson had completed a drug-and-alcohol assessment and, per the recommendation, had entered a long-term substance-abuse treatment program. The trial court ordered Venson to undergo a psychological evaluation and attend counseling and stated that the goal of the case remained reunification. The trial court also gave Venson visitation with C.M. and ordered that the mother have no visitation until she came before the court, which she never did. Importantly, in a subsequent review order entered on July 6, 2020, the trial court found that Venson had complied with the case plan—specifically that he had employment, was continuing his drug treatment, and was in counseling—and again stated that the goal remained reunification.

On December 9, 2020, the trial court entered a permanency-planning order. In that order, the trial court continued the goal of reunification and again found Venson in compliance with the case plan. The trial court stated that Venson had completed his drug treatment, was maintaining sobriety, had completed a psychological evaluation, was attending counseling, had obtained a driver's license and a vehicle, and was living in a three-bedroom mobile home. The trial court noted in the permanency-planning order that, in

4

light of Venson's progress, the court had authorized a trial home placement that had begun on October 10, 2020.

On December 17, 2020, the trial court entered a fifteen-month-review order. In that order, the trial court stated that the trial home placement had ended[3] due to Venson's allowing C.M. to be unsupervised around inappropriate people, including her mother, and in unsafe conditions. The trial court reiterated the particulars of Venson's compliance with the case plan and gave DHS discretion to increase visitation as soon as a safe and viable visitation plan was developed.

A second permanency-planning order was entered on March 29, 2021. In that order, the trial court changed the goal of the case from reunification to adoption. The trial court found:

> After considering the evidence, the available permanency planning dispositions, and the juvenile's best interest, health, safety, and welfare, the Court finds that the goal of the case shall be adoption and parental rights will be terminated. *The father is not making good decisions and is putting the child in unsafe situations. The father took the child to [North] Little Rock to see the mother at a motel.* This was after the mother was arrested for "cutting her baby daddy to the bone" and spending 64 days in jail. *The father was involved in an altercation while the child was on a trial home placement.* The victim in the altercation was taken to the hospital for the injuries he suffered. *The father took his girlfriend to visit the child after the Department told him it was not appropriate.* The juvenile shall remain in the custody of the Department because the juvenile's health and safety cannot be protected by the father if returned to the father.

(Emphasis added.)

---

[3]The record shows that the trial home placement ended on November 20, 2020.

On June 16, 2021, DHS filed a petition to terminate Venson's parental rights.[4] DHS alleged that termination of parental rights was in C.M.'s best interest and alleged the following two statutory grounds. Pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a), DHS alleged that other factors or issues arose subsequent to the filing of the original petition for dependency neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent. DHS also alleged, pursuant to subdivision (b)(3)(B)(ix)(a)(3), that Venson had subjected C.M. to aggravated circumstances in that there is little likelihood that services to the family will result in successful reunification. The termination hearing followed on July 22, 2021.

On July 30, 2021, the trial court entered an order terminating Venson's parental rights. The trial court found by clear and convincing evidence that termination of parental rights was in C.M.'s best interest, and the court considered the likelihood that the C.M. would be adopted as well as the potential harm of returning her to Venson's custody as required by Arkansas Code Annotated section 9-27-341(b)(3)(A)(i) & (ii). The trial court specifically found:

> Termination of parental rights is in the best interest of the juvenile, taking into consideration the likelihood that the juvenile will be adopted if the termination petition is granted. The Court finds that the juvenile is adoptable. There are no

[4]In the petition, DHS noted that C.M.'s mother had passed away on May 31, 2021.

barriers to the child being adopted. There is the potential harm to the health and safety of the juvenile caused by returning the child to the custody of the father. *The father has completed the ordered services and has checked all the boxes. The only thing keeping the father from his child is his poor parenting decisions.* The child was placed on a trial home placement with the father but had to be removed from the trial home placement because the father continued to make poor decisions. *The father took the child to see her mother in a motel in North Little Rock.* The mother has serious criminal issues including prostitution. The mother was involved in a serious physical altercation and stabbed her boyfriend with a knife. *When the Department went on a home visit the child was observed outside the home, in a ditch, with no supervision. The father was involved in a serious physical altercation while the child was on a trial home placement.* The father continues to bring his girlfriend, Miranda Foster, to visits with the child. Miranda Foster has not provided the Department with any drug screens. Miranda Foster is a convicted felon and testified that she was convicted in Arizona on meth possession. Miranda Foster testified that she spends almost every night with the father.

(Emphasis added.) The trial court also found clear and convincing evidence of the two statutory grounds alleged by DHS, i.e., "other factors" and "aggravated circumstances."[5]

At the termination hearing, Venson was the first to testify. Venson testified that he has been sober for more than a year and that he now realizes that using drugs is what "took [me] away from [my] daughter." Venson stated that he completed his drug-rehabilitation program in August 2020, and that since then has tested negative on every drug screen. Venson further stated that since then he has lived in the same home and had the same

---

[5]We observe that, in the termination order, the trial court stated, "The *mother* has been found by a Court of competent jurisdiction, including the Juvenile Division of Circuit Court to: Have subjected to any juvenile to aggravated circumstances. The Court finds that there is little likelihood of successful reunification." (Emphasis added.) This appears to be a clerical error because, as found by the trial court in the termination order, C.M.'s mother was deceased and Venson was the only parent whose rights were being terminated. At any rate, Venson concedes in his brief that the trial court terminated his parental rights under both the "other factors" and "aggravated circumstances" statutory grounds that were alleged in DHS's petition.

7

employment doing concrete work. Venson stated that he still had everything set up so his home would be ready for C.M. and that DHS had not told him there was anything inappropriate about his home.

Venson indicated that he consistently visits C.M. during the scheduled weekly visitation periods. Because Venson lives in Bigelow and C.M.'s foster placement is in Fayetteville, this requires a round-trip drive of around six hours. Venson stated that his visits with C.M. last about four hours.

Venson acknowledged that during the trial home placement, he took C.M. to see her mother, who he knew had a criminal history. However, he maintained that he did this only because C.M.'s mother was battling cancer and was "on her deathbed." Venson indicated that during the visit, C.M.'s mother was bedridden and could barely walk. Venson stated that this was the only time he had taken C.M. to see her mother. Venson also stated that he had been in the process of divorcing C.M.'s mother when she passed away in May 2021.

Venson was questioned extensively about Miranda Foster. Venson stated that Miranda is his former girlfriend, and that she lived with him for a couple of months "after [his] daughter was [taken]" but she moved out after that. Miranda did not live with Venson during C.M.'s trial home placement with him. Venson stated that that he and Miranda "still talk every now and then, but we're not together." Venson stated that Miranda came with him to the termination hearing for moral support.

Venson stated that he had never seen Miranda use illegal drugs or appear to be under the influence of drugs. Venson acknowledged that, despite DHS's admonition that Miranda

8

was not to accompany him on his visits with C.M., Miranda had driven him in her vehicle from Bigelow to Fayetteville to some of these visits. Venson stated that his car was in disrepair and that he needed a ride.

Venson was also questioned about an altercation he had on Halloween night of 2020, which was during C.M.'s trial home placement with him. Venson stated that on that night, C.M. was trick-or-treating with his brother's children and did not witness the incident. Venson and the other man fought about a gun that had allegedly been stolen from Venson, and when Venson struck the man, he fell and hit his head on the asphalt. Venson stated that no criminal charges arose from the incident. It is undisputed that C.M. was not present during the altercation and did not witness the incident.

DHS employee Kayla Manrrique is an adoption specialist and the former family-service worker on this case. Ms. Manrrique was the family-service worker until the trial home placement ended. Ms. Manrrique testified that Venson was cooperative with DHS, had completed everything in the case plan, and was doing well when the trial home placement began.

Ms. Manrrique testified that the trial home placement ended about a month and a half later. On the day that DHS terminated the trial home placement, Venson was at work, and C.M. was in the care of Brandy Helfrich, a woman whom Venson had known since childhood and considered to be his mother. Ms. Helfrich lived on the property next to Venson's property and had been approved by DHS to babysit C.M. When Ms. Manrrique made a visit that day, she saw C.M. alone in Ms. Helfrich's yard, in a ditch near the road.

9

Ms. Manrrique apparently interviewed C.M., and C.M. disclosed that during the trial home placement she had visited her mother and that her father had been involved in an altercation. It was based on these facts that DHS decided to end the trial home placement. After the trial home placement ended, Ms. Manrrique made the decision to place C.M. in a foster home in Fayetteville some three hours from where Venson lives, acknowledging that she made no effort to find a foster home that was closer.

Ms. Manrrique testified that C.M. is a very loving and sweet child with no major mental-health issues and that if the court terminated parental rights, it was very likely that C.M. would be adopted. She stated that C.M.'s current foster placement was willing to adopt her.

Tammy Foster, the current family-service worker on the case, testified next. Ms. Foster first testified about her concerns with Miranda Foster.[6] Ms. Foster was concerned that Miranda was using drugs. Ms. Foster stated that three times she attempted to drug screen Miranda at Miranda's residence in Morrilton where she lives with her parents, but on each occasion, Miranda's mother reported that Miranda was at work or otherwise not at home. Ms. Foster also stated that she went to the convenience store where Miranda worked to try to get a drug screen but that the store was very busy and she never spoke with Miranda. Ms. Foster, however, stated that on that occasion she observed Miranda to be "visibly high," so a drug screen was unnecessary. Ms. Foster stated that the only time she was able to attempt a

---

[6]We will refer to caseworker Tammy Foster as "Ms. Foster" and Miranda Foster as "Miranda."

10

drug screen on Miranda was on the day of the termination hearing and that Miranda advised that she had a bladder condition and could not produce a sample. Ms. Foster also expressed concerns about Miranda accompanying Venson on his visits with C.M. against DHS's instructions.

Concerning Venson, Ms. Foster testified that he had completed all the services provided, including parenting classes, a psychological evaluation, drug treatment, and counseling. Ms. Foster stated further that Venson maintained a residence and employment. Ms. Foster, however, recommended termination of Venson's parental rights because, in her opinion, Venson continued to demonstrate unsafe judgment, which placed C.M. in danger if returned to his custody. Although Venson had not tested positive for drugs since completing his drug treatment, Ms. Foster was concerned that he was still using drugs. Ms. Foster stated that on the four occasions she went to Venson's home to drug test him, he was there only once, at which time he tested negative. Ms. Foster suspected that Venson was evading being tested. Ms. Foster also expressed concern because Venson had told her that drug use does not affect his ability to parent and that he was a good parent whether or not he used drugs. Ms. Foster admitted that despite her suspicions DHS had no evidence that Venson had been using drugs at any time in the recent past.

Ms. Foster acknowledged that Venson had been consistent in traveling to Fayetteville for his visits with C.M. and that he routinely visited for the full four hours. Ms. Foster stated, however, that during Venson's visits with C.M., he would give her inappropriate gifts and twice gave her $100 bills. She also stated that instead of Venson parenting C.M. during

11

these visits, they interacted like "playmates" or "best friends." Ms. Foster also testified that "there is absolutely no question that [Venson] loves [C.M.]" and that "that is not a question that anybody has."

Brandy Cochran is the local DHS supervisor, and she has supervised this case since C.M.'s initial removal from Venson's custody. Ms. Cochran expressed concerns about Venson's decision-making skills, going back to the conditions causing C.M.'s removal. Brandy stated that after C.M.'s removal, Venson had done "amazing" while in drug rehabilitation, and she had no evidence that he had not maintained sobriety since then. Brandy stated further that she has observed several visits between Venson and C.M. and that they love each other very much. Brandy, however, thought that Venson does not know how to parent C.M. She stated that Venson was very attentive and played with C.M. during the visits but would let her "run wild" and allow her to have junk food for dinner.

Ms. Cochran shared Ms. Foster's concerns about Miranda accompanying Venson on his scheduled visits with C.M. and stated that Miranda would sometimes interject herself into the visits. Ms. Cochran arranged for both Venson and Miranda to meet her at the DHS office, at which time she attempted to drug test both of them. Venson tested negative on the drug screen. Miranda, however, stated that she was unable to produce a sample. Ms. Cochran testified that during this office visit, Miranda was clearly under the influence of drugs.

Ms. Cochran acknowledged that Venson had completed the services offered by DHS and had made some good choices during the case. Ms. Cochran, however, was concerned

12

about Venson's ability to make good decisions and stated that C.M. needs permanency and safety. Ms. Cochran recommended termination of Venson's parental rights, stating that although "*this is not a clear-cut case*" Venson remained lacking in some very important areas.

Miranda Foster testified next. Miranda stated that she has a condition called interstitial cystitis that makes it difficult to urinate and for which she takes a medication called Elmiron. Miranda acknowledged a prior felony drug conviction in Arizona in 2015 and a misdemeanor drug conviction in Arkansas in 2019. Miranda, however, denied current drug use and stated that she would take a blood test if ordered by the court.

Miranda briefly lived with Venson after DHS terminated C.M.'s trial home placement in November 2020. Miranda moved out shortly thereafter and now resides in Morrilton with her parents. Miranda stated that, although she now has a separate residence, she frequently stays the night at Venson's house. Miranda works five days a week at a convenience store in Morrilton and also does some yard work on the side.

Miranda acknowledged that she was admonished by DHS to not attend Venson's visits with C.M. but stated that she was never told she could not drive him there. Miranda stated that she began driving Venson to his visits in Fayetteville because his car was broken down but acknowledged that his car is now working, and she still drives him to the visits. Miranda stated, however, that she does not participate in the visits other than "a few minutes here and there" to "bring drinks or whatever."

Miranda was unsure about the status of her relationship with Venson but stated that she wants C.M. returned to Venson and that she wants them to be a family. Miranda also

stated that she does not want to cause any complications and that, if necessary, she would "walk away for good because they're more important than my happiness." She stated, "I will step away because that's what has to be done for her and her father."

Brandy Helfrich, Venson's friend and neighbor, testified next about the circumstances resulting in C.M.'s removal from her trial home placement with Venson. Brandy stated that she has known Venson since he was a child and that he calls her mom. She lives next to Venson and was babysitting C.M. while Venson was at work. DHS approved Brandy to be C.M.'s babysitter. Although Brandy was approved by DHS to babysit C.M., she was supposed to be doing it at Venson's house because Brandy's boyfriend has a criminal history. Brandy, however, was watching C.M. at her house, and she explained that Venson did not have a TV and did not have an internet connection necessary for C.M. to do her homework. Brandy stated that while she was watching C.M., she had gone to the restroom for maybe four minutes, during which time C.M. was found in the ditch by the caseworker.

On appeal from the termination of his parental rights, Venson challenges the sufficiency of the evidence to support the two statutory grounds found by the trial court and further argues that there was insufficient evidence that termination of his parental rights was in C.M.'s best interest. Because we hold that the trial court clearly erred in finding that termination of Venson's parental rights was in C.M.'s best interest, we need not discuss whether DHS established the requisite statutory grounds.

We have said it so frequently that it is now axiomatic: few consequences of judicial action are so grave as the severance of natural family ties. *See Meyers v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 614, 533 S.W.3d 654. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. *Rhine v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 649, 386 S.W.3d 577. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Id.*

C.M. was initially removed from her father's custody primarily due to Venson's illegal drug use. In response to the removal, Venson made the choice to comply with the services offered by DHS, which included a long-term drug-treatment program, to work toward reunification with his daughter. According to the DHS supervisor, Venson had done "amazing" while in drug rehabilitation, and she had no evidence that he had not maintained sobriety since then. After completing the drug-treatment program, Venson has maintained appropriate housing and consistent employment. Venson has completed all the services offered by DHS. And, despite having to drive six round-trip hours from Bigelow to Fayetteville, Venson has consistently attended his scheduled visitations with C.M. DHS employees testified that, from observing these visits, it is evident that Venson and C.M. love each other very much. Although the testimony showed that Venson's parenting skills need improvement, Venson and C.M. were described as "best friends." It is beyond dispute that Venson cares deeply for C.M. and has taken considerable measures to reunify the family.

15

In finding that termination of Venson's parental rights was in C.M.'s best interest, the trial court stated that Venson had "completed the ordered services" and that "the only thing keeping [him] from his child is his poor parenting decisions." In the termination order, the trial court identified these four issues: (1) Venson taking C.M. to see her mother during the trial home placement; (2) Venson's physical altercation with a man during the trial home placement; (3) C.M. being found alone in a ditch outside the babysitter's house, which effectively ended the trial home placement; and (4) Venson's relationship with Miranda Foster. While each of these issues have some relevance, on the entire record, we are left with a definite and firm conviction that a mistake was made in terminating Venson's parental rights.

With respect to Venson's decision to take C.M. to see her mother, he explained that C.M.'s mother was terminally ill, and this would be the last time C.M. would see her mother before she died. Regarding Venson's physical altercation that occurred on Halloween night, this appeared to be an isolated incident, not witnessed by C.M., from which no criminal charges arose. And with respect to the caseworker's finding C.M. in the ditch, this occurred while Venson was at work, and C.M. was in the care of a DHS-approved babysitter who had taken a few minutes to use the restroom. None of these incidents, either alone or collectively, can support a finding that termination of Venson's parental rights is in C.M.'s best interest.

The trial court's biggest concern appeared to be Venson's relationship with Miranda Foster, who has prior felony and misdemeanor drug convictions. The trial court noted that Miranda had not provided DHS with any drug screens. However, the caseworker admitted

16

that she had never personally asked Miranda to participate in a drug screen until the day of the termination hearing when Miranda could not produce a urine sample, as explained above, but was willing to submit a blood sample. Miranda was also driving Venson to his visits with C.M. While we share the trial court's concern about this relationship, the record shows that Miranda no longer lives with Venson and has her own residence. There was also no evidence that, during C.M.'s trial home placement with Venson, Miranda had ever spent the night there. The exact status of their relationship is unclear, and the record does not show that either the trial court or DHS informed Venson that preservation of his parental rights depended on his termination of this relationship. In light of the unrefuted evidence of Venson's compliance, progress, and close bond with C.M., we conclude that his association with Miranda cannot justify the trial court's order severing Venson's parental rights.

The clear-and-convincing standard of proof reduces the possibility that a parent's rights are terminated based on a few isolated instances of unusual conduct or idiosyncratic behavior and impresses the fact-finder with the importance of the decision and thereby perhaps to reduce the chances that an inappropriate termination is ordered. *Santosky v. Kramer*, 455 U.S. 745 (1982). A termination of parental rights is both total and irrevocable— it leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18 (1981). As

17

long as there is reason to believe that positive, nurturing parent-child relationships exist, the law favors preservation, not severance, of natural familial bonds. *See Santosky*, *supra*.

Although Venson may not be a perfect parent, the law does not require him to be perfect in order to retain his parental rights. *See Rhine*, *supra*. Throughout the case Venson's close reciprocal relationship with C.M. has been evident. There is no evidence that any harm or real risk of potential harm was introduced into C.M.'s life by Venson's slight lapses in judgment or that her best interest would be served by having her father permanently and irrevocably removed from her life. Having considered the evidence before us, we find clear error in the trial court's termination of Venson's parental rights, and we reverse and remand.

Reversed and remanded.

WHITEAKER and MURPHY, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Casey D. Copeland*, attorney ad litem for minor child.