2011 Ark. App. 649

**Darrell RHINE, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Child, Appellees.**

**No. CA 11–548.**

Court of Appeals of Arkansas.

Nov. 2, 2011.

Deborah Ruth Sallings, Little Rock, for appellant.

Tabitha Baertels McNulty, Little Rock, for appellee.

LARRY D. VAUGHT, Chief Judge.

In an order filed March 10, 2011, the Washington County Circuit Court terminated appellant Darrell Rhine's parental rights to his daughter, R.R. (born October 16, 2008).[1] Rhine appeals from the termination order, contending that the circuit court erred in finding that it was in the child's best interests to terminate his parental rights. We hold that the circuit court clearly erred in finding that termination of Rhine's parental rights was in his daughter's best interests. Accordingly, we reverse the order terminating his parental rights.

On February 24, 2009, police responded to a domestic disturbance between Rhine and R.R.'s mother. Following the incident, Rhine was arrested for possession of a controlled substance, probation violation, and domestic assault. Officers at the scene also observed that R.R.'s mother was under the influence of methamphetamine and had numerous track marks on her arms. Based on these events, the Arkansas Department of Human Services (DHS) took R.R. into custody, and the court adjudicated her dependent-neglected on April 15, 2009.

A review hearing was held on September 2, 2009. R.R.'s mother did not appear, and the court found that her whereabouts were unknown and that she had not complied with any of the court orders or demonstrated fitness to parent R.R. Rhine was still in jail and had established paternity; nevertheless, the court changed the goal from reunification to adoption. The court ordered Rhine, upon his release from jail, to call DHS caseworker Steve Hodge once a week, get a job, pass weekly drug screens, maintain stable housing and employment, maintain contact with his attorney, and follow the terms of his probation and parole.[2]

At the permanency-planning hearing held on February 3, 2010, the court found that the goal of the case should continue to be adoption, despite the fact that certificates reflecting Rhine's completion of life-skills and parenting classes (while in prison) were entered into the record and considered by the trial court. The court also found that Rhine, who was still incarcerated, had "not participated in the services provided by [DHS]." The court directed counsel for DHS to file a termination-of-parental-rights (TPR) petition by March 3, 2010, and ordered Rhine (immediately following his release) to participate in supervised visits with R.R. for one hour each week. The court set the TPR hearing for April 29, 2010.

---

1. The circuit court also terminated the parental rights of R.R.'s mother in a separate proceeding, and that disposition is not relevant to this appeal.

2. The addendum does not contain the document setting forth the terms of his release; however, the permanency-planning-hearing order entered February 4, 2010, states that his parole-release form was entered into the record.

Rhine was released from jail on February 24, 2010. At the TPR hearing on April 29, the court terminated the parental rights of R.R.'s mother. However, the court did not terminate Rhine's parental rights, finding that he had passed his drug screens since being released, had maintained employment and had participated in parenting classes, and had made progress toward reunification. The court ordered DHS to provide Rhine with services and ordered Rhine to cooperate with DHS, to keep them informed of where he was living, to maintain contact with his attorney, to not use alcohol or illegal drugs, to pass random drug screenings twice a month, to finish taking his parenting class and demonstrate that he could protect R.R. and keep her safe from harm, to maintain stable housing and employment to maintain a clean and safe home, and to follow the law and the terms of parole. The court increased Rhine's supervised visits with R.R. to three hours per week.

On June 28, 2010, an agreed order was entered finding that Rhine had attended each weekly visit and that the eight visits had "gone extremely well and [Rhine] ha[d] displayed excellent parenting skills during the visits, and ha[d] formed a good bond with [R.R.]" The court further found that Rhine had passed all his weekly drug screens and had followed through with getting a drug-and-alcohol assessment as ordered by the court. The court recommended unsupervised visits and scheduled a permanency-planning hearing for July 28, 2010. At the July 28 hearing, the court changed the goal of the case to reunification with Rhine and ordered that custody would return to him on September 1.

The court also allowed Rhine unsupervised, overnight visits with R.R. once a week for two weeks, then two overnight visits a week for the following two weeks. The court also ordered that once Rhine resumed custody, the foster parents be permitted visits with R.R. at least once a week or more. Per the hearing order, the court observed that Rhine "has followed the Court orders, has passed drug screens, maintained stable housing and employment, has had visits that have been very appropriate, he is the biological and legal father of [R.R.]—He has shown he is *very* committed to [R.R.] and has worked hard since getting out of prison & has shown he is stable and can properly parent [R.R.]" (Emphasis in original.) Again, the court ordered that Rhine follow the court orders and terms of his parole and to make sure R.R. had no contact with her mother. The court also ordered DHS to provide daycare for R.R. as a service to assist with reunification. On September 1, 2010, the court placed custody of R.R. with Rhine and found that it was in R.R.'s best interests to do "phased-in expanded visits."

After almost two months of progress, on October 25, 2010, DHS took R.R. into emergency custody, and at a review hearing on October 27, 2010, the court found that R.R. could not return to Rhine because of two alleged events involving alcohol—the use of which was in violation of Rhine's parole and the court's orders. The first event involved the consumption of alcohol while watching television. The record shows that Rhine had his brother and three to four friends over to his apartment to watch a football game between Arkansas and Ole Miss, and during the course of the evening (which included a five-hour delay of the game due to lightning) the men went out to buy a twelve-pack of beer and shared it. The testimony reflects that R.R. was not present for any of this because she was spending the night with a family friend.

The second incident involved alcohol located in a vehicle. According to the testimony, Rhine rode with friends to pick up R.R. from daycare. One of the other men

had an open container of liquor in the car, and they went through the drive-through at a liquor store with[5] R.R. in the car. A police officer stopped the car and found that the driver had a suspended license but did not ticket anyone or confiscate the alcohol. There was no evidence presented suggesting that Rhine was consuming alcohol or knew that the driver had a suspended license. Additionally, at the October 27 review hearing, the court also found that Rhine had failed to inform DHS that he had moved with R.R. to a new home. As a result, R.R. was returned to her former foster parents, and the court set a show-cause hearing for December 15. The court ordered that "If dad comes to visits with liquor on his breath or high, all visits [shall] stop!" and "Father follow *all* terms of parole!" (Emphasis in original.)

At the hearing held on December 15, 2010, the court found that Rhine had been drinking alcohol against court order and was making choices not in R.R.'s best interests. The poor choices cited by the court were the car incident and appellant moving in with a woman he had only known for two months. The court found that Rhine had failed to comply with court orders based on the same incidents addressed at the October 27 review hearing.

At a TPR hearing held on February 17, 2011, the court terminated Rhine's parental rights based on the two alcohol incidents, the fact that on one occasion Rhine had consumed alcohol in violation of the terms of his parole and the court's orders, and had failed to visit R.R. since December 2010. The court noted that although the parole officer had not taken action after being informed that Rhine had drunk alcohol, the parole officer was being "easy" on Rhine and R.R. was put at risk by Rhine violating his parole and risking revocation. The termination order stated that Rhine had failed to remedy the factors leading to R.R.'s removal, but in the

place where such services are to be listed, none are noted. At the hearing, the circuit court added the[6] fact that Rhine had failed to contact DHS caseworker Steve Hodge on a weekly basis, had missed several drug screens as additional reasons for terminating his rights, and had failed to attend several visitations with R.R. after her removal. In a dramatic move, the court ordered that Rhine was authorized to have a final, one-hour visit with R.R. at the DHS facility and directed R.R.'s foster mother to provide Rhine a photo of R.R.

■ An order terminating parental rights must be based upon a finding by clear and convincing evidence that termination of a parent's rights is in the best interest of the children, considering the likelihood that the children will be adopted if the parent's rights are terminated and the potential harm caused by returning the children to the custody of the parent. Ark.Code Ann. § 9–27–341(b)(3)(A) (Supp. 2005). The court must also find one of the grounds outlined in § 9–27–341(b)(3)(B). In this case, the court based its termination order on subsections (b)(3)(B)(i) and (vii):

> (i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.
>
> . . . .
>
> (vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has

manifested the incapacity ... to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

 Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Causer v. Ark. Dep't of Human Servs.*, 93 Ark. App. 483, 220 S.W.3d 270 ⌐₇(2005). "[A] parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment." *Troxel v. Granville*, 530 U.S. 57, 77, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (Souter, J., concurring). However, courts are not to enforce parental rights to the detriment or destruction of the health and well-being of a child. *Causer*, 93 Ark. App. at 486–87, 220 S.W.3d at 273. A heavy burden is placed on a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Id.*, 220 S.W.3d at 273. Clear and convincing evidence is that degree of proof which will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Id.*, 220 S.W.3d at 273.

 This standard of proof reduces the possibility that a parent's rights are terminated based on "a few isolated instances of unusual conduct or idiosyncratic behavior" and "impresses the fact[-]finder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate terminations will be ordered." *Santosky v. Kramer*, 455 U.S. at 745, 764–65, 102 S.Ct. 1388. "A termination of parental rights is both total and irrevocable.... [I]t leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development." *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 39, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

 We do not reverse the circuit court's finding of clear and convincing evidence unless that finding is clearly erroneous. *Causer*, 93 Ark.App. at 487, 220 S.W.3d. at 273. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Yarbrough v.* ⌐₈*Ark. Dep't of Human Servs.*, 96 Ark.App. 247, 240 S.W.3d 626 (2006). This, however, does not mean that the appellate court is to act as a "super factfinder," substituting its own judgment or second guessing the credibility determinations of the court; we only reverse in those cases where a definite mistake has occurred. *Id.* at 249, 240 S.W.3d at 627. We are convinced, however, that here such a definite mistake has occurred.

Rhine without question did consume alcohol after his release from jail, which violated the terms of his parole and the court's orders. Rhine also permitted R.R. to ride in a car with a passenger who had an open container of alcohol. Rhine acknowledged that it was a poor decision and stated his regret for allowing it. Rhine also accepted the court's criticism that he had (in the court's own words) become "less gung ho" about complying with certain DHS reporting requirements, and he acknowledged a need for improvement.

However, these isolated and minor incidents of noncompliance or "being less gung ho" do not necessitate a termination of Rhine's parental rights in order to protect R.R. First, with regard to the court's primary concern of alcohol issues, there was no evidence presented that Rhine was ever intoxicated or in actual risk of his parole being revoked. When his parole officer was informed of the alcohol inci-

dents, the officer took no action. As of the date Rhine's parental rights were terminated, he had only six months left on his parole. Rhine and his brother testified that Rhine had not consumed alcohol since R.R. was taken back into DHS custody in October 2010, and DHS presented no evidence to the contrary. Also, in spite of its professed concerns about alcohol, the circuit court never attempted to address that issue with alcohol-related services or measures like AA or NA. In fact, other than daycare services provided by DHS, the court's orders do not reflect that any services were provided to the appellant other than the ones he successfully participated in, such as parenting, anger management, and life-skills classes, most of which he completed before he was released from jail.

As a secondary ground for TPR, the circuit court found that Rhine had attended only two of his weekly scheduled visits with R.R. from December 15, 2010 to February 17, 2011. At the TPR hearing, the court acknowledged that two of those visits had to be canceled because the DHS office was closed due to inclement weather and that those two visits did not "count." Of the five remaining missed visits, there was evidence that Rhine missed one because he was sick and one because he had to work out of town and did not want to lose his job (maintaining employment being one of the court's continuing orders). Rhine missed one of the three other visits for an unspecified reason and attempted to reschedule, but DHS could not accommodate him because they were "booked up." At worst, Rhine had three "unexcused" absences and at best, two. Although less than perfect with his visitation, the record establishes that Rhine did not overtly neglect his duty to attend visitation for a two-month period.

Rhine testified that his girlfriend had moved out of the home based on his decision to place R.R. first. Indeed, by all accounts R.R. was a well-adjusted, developmentally normal child who had bonded very well with Rhine in the short time they had lived together. All visits between R.R. and Rhine were noted to be very successful, and the evidence and testimony as a whole show Rhine to be a loving father who worked hard upon his release from jail to achieve reunification with R.R. by maintaining a stable job and good housing, staying off drugs, providing love to R.R., and complying with the court's orders. The only significant exception to that compliance was his occasional, moderate consumption of alcohol. We are mindful of the circuit court's duty to ensure that R.R.'s best interests are served, and we are respectful of the court's power to order certain behavior to serve that end. We also agree that disregarding a court's order should have consequences. However, in this case, where the court itself stated that "this isn't about that little thing of drinking some beer," which "in the whole scheme of things, [is] not a big deal," the consequence was too severe.

Termination of parental rights should be the goal only when "the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective." Ark.Code Ann. § 9–27–341(a)(3) (Supp. 2005). "Few consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby deprived of his physical liberty often retains the love and support of family members." *Santosky,* 455 U.S. at 788, 102 S.Ct. 1388 (Rehnquist, J., dissenting). The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they

have not been model parents or have lost temporary custody of their child to the State. *Benedict v. Ark. Dep't of Human Servs.*, 96 Ark.App. 395, 396–99, 242 S.W.3d 305, 307–09 (2006). Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Id.*, 242 S.W.3d at 309.

Certainly Rhine did not demonstrate flawless compliance with all of the circuit court's orders. He is certainly not a perfect parent; but the law does not require him to be perfect in order to retain his parental rights. There is no evidence that any harm or real risk of potential harm was introduced into R.R.'s life by Rhine's slight lapses in judgment, or that her best interests would be served by having her father permanently and irrevocably removed from her life. In this case, by all standards, the greater quantum of evidence favors reunification over termination. Consequently, we are left with the definite and firm conviction that a mistake has been made. Based on the evidence before us, we find clear error in the circuit court's termination of Rhine's parental rights and reverse.

Reversed.

HOOFMAN and BROWN, JJ., agree.