Cite as 2024 Ark. App. 514

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-24-82

| | |
|---|---|
| | Opinion Delivered October 23, 2024 |
| GEORGIA HARRIS AND CHRISTOPHER ELLIOTT | APPEAL FROM THE LOGAN COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 42PJV-22-5] |
| APPELLANTS | |
| V. | |
| | HONORABLE TERRY SULLIVAN, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | |
| APPELLEES | |
| | AFFIRMED |

## MIKE MURPHY, Judge

Georgia Harris and Christopher Elliott appeal the Logan County Circuit Court's decision to terminate their parental rights. Georgia is the mother of MC1, MC2, and MC3. At the time of removal, MC1 was two years old, and twins MC2 and MC3 were one. Christopher Elliott is the father of MC1.[1] Elliott makes two arguments on appeal: first, that he was denied due process because the Arkansas Department of Human Services (DHS) failed to secure his participation in the case; second, that grounds did not support termination. Harris argues that termination of her parental rights was unsupported by either grounds or best interest. We affirm.

---

[1] The father of MC2 and MC3 is not a party to this appeal.

On March 30, 2022, DHS received a call through the child abuse hotline from an ER doctor at Mercy Hospital in Ozark who reported that two young children (MC1 and MC2) needed to be flown to Children's Hospital due to head and neck injuries they sustained in a car accident. They had not been correctly restrained in car seats. Their mother, appellant Georgia Harris, had been driving. Harris was arrested on multiple charges and taken to jail. A DHS family service worker went to the jail that same night to visit Harris, to find out Harris was being administered Narcan. DHS exercised emergency custody of the two children. The following day, DHS exercised emergency custody of MC3, who had been with a family friend. At the time of the children's removal, Elliott was in prison.

On June 28, on the parents' stipulation, the three children were adjudicated dependent-neglected due to parental unfitness and drug use. The order provides that all three parents were properly served, but neither of the fathers was present.

At the September review hearing, the court found that Elliott is MC1's father but remained incarcerated. It further found that Harris had complied with the case plan and orders of the court. Harris was approved for a trial home placement upon the attorney ad litem's agreement. The December review order likewise demonstrated that Harris was in compliance. That order acknowledged that Harris had some unresolved criminal issues and that they would be addressed at the next hearing in March. The December order recited that Elliott was still incarcerated and was not working the case plan, but the court did appoint counsel to represent Elliott going forward.

In the order following that March 2023 hearing, the court found that the goal would continue to be reunification with Harris because she was making significant, measurable progress and diligently working toward reunification: "The Court notes that reunification is expected to occur within a time frame that is consistent with the juveniles' developmental needs." The order recites that Elliott was represented by counsel but otherwise does not mention him. DHS was ordered to "find out the status of the mother's criminal case."

On June 1, the last day of the trial home placement, family service worker Brandy Ezell and her supervisor, Pamela Feemster, went to Harris's house to pick up the children because Harris had court later that day and was under the impression she would be put in jail. Harris used drugs sometime between 8:00 a.m. when Ezell and Feemster picked up the children and 11:00 a.m. when Harris arrived at the courthouse—she was reportedly "under the influence [and] very high." A DHS worker met her at the courthouse and drug tested her, and Harris tested positive for methamphetamine, among other things.

At the review hearing on July 5, Caseworker Ezell testified that she was very surprised because Harris had been clean the entire time the case was open, and the children had been happy and healthy, and their needs had been met during the trial home placement. Ezell said that at the previous hearing, it seemed as though Harris would be put on probation, but since then, Harris had acquired an additional charge of failure to appear, had received fifty-four months' incarceration on her criminal charges, and was currently incarcerated.

Regarding Elliott, Ezell testified that he had been incarcerated for the entire case, and no one from DHS had gone to visit him, had a phone call with him, or offered him any services. Further evidence established that Elliott would be released from prison August 10.

The ad litem advised against changing the case's goal at that time to ensure that all procedural processes were correctly followed. The court agreed that "the dads should've been involved," but it still allowed DHS to change the goal. "These children need permanency . . . . I'm not saying I will terminate rights. We'll have a hearing." A termination-of-parental-rights hearing was set for October, but the court was clear that it wanted to hear from the fathers. Elliott was appointed new counsel; the record indicated his former counsel had failed to file a motion to withdraw earlier in the case. DHS subsequently filed a petition to terminate the parental rights of all three parents.

The termination hearing was held on October 4, 2023. Ezell testified first. Regarding Elliott, she said that upon his release from incarceration, he did not ask for any services, just visits; but he had only one visit since August. She said he wanted his daughter, MC1, to be placed with his father, but he could not currently take her. Elliott had been incarcerated throughout most of the case but had completed several services while in prison. Ezell said there were still services DHS could provide to Elliott: parenting classes and visits, individual counseling, and a drug assessment. It was her impression, however, that Elliott did not want to participate in the case plan or receive services. She said he did not want custody; he wanted his daughter to go live with his father.

Regarding Harris, Ezell testified that she had been clean for the entirety of the case but failed her drug test at the courthouse on June 1. Harris loves and is bonded with her children. Harris's home was appropriate. But Harris was incarcerated and would continue to be until at least the following March.

Harris testified that she took the drugs before her court appearance because she was already resigned to losing her kids. She admitted she was so intoxicated that she was not allowed to enter her guilty plea until the following day. She said that she has a job available when she gets out and that she can take parenting classes and counseling sessions while in prison.

Elliott testified that he had served the entirety of his prison sentence, and while he was incarcerated, he had completed classes on parenting, anger management, communication skills, thinking errors, and substance abuse. He was never notified about his case despite writing letters asking for information and visitation, and he was never notified he was appointed an attorney in December 2022. He never saw a case plan or met with a caseworker. He said that he could not take his daughter with him today but that she could go to his father's house.

DHS supervisor Pamela Feemster testified that Elliott's father and stepmother were not currently considered for placement by DHS because of some information that showed up on Elliott's father's background check.

Finally, there was testimony that the children are well adjusted in the foster placements, receiving appropriate therapies, and are adoptable. There are multiple adoptive families interested in the children.

During closing arguments, Elliott's counsel argued that DHS had not provided his client any services, Elliott is no longer incarcerated, and the other placement options had not been adequately explored. Harris's counsel argued that clear and convincing evidence did not support termination, considering her compliance throughout the case and the relatively short amount time she is expected to be incarcerated.

The court found that grounds supported terminating both parents' parental rights and that it was in the children's best interest to do so. It granted DHS's petition, and an order reflecting the ruling was entered on November 14. That order provided that it was terminating Harris's parental rights on the following grounds: Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) (Supp. 2023), twelve-month failure to remedy by a custodial parent; Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*), subsequent factors; and Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*), aggravated circumstances. The same order provided that it was terminating Elliott's parental rights pursuant to the following grounds: Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*b*), twelve-month failure to remedy by a noncustodial parent; Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(*a*), failure to provide support or maintain contact; Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*), subsequent factors; and Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*), aggravated circumstances.

Both parents appeal, but the arguments were presented to this court in separate briefs. We will address each parent's arguments individually.

## I. *Standard of Review*

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. *Gilbert v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 256, 599 S.W.3d 725. The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juvenile will be adopted and of the potential harm that would be caused by returning custody of the child to the parent. *Id.* Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Harris v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 135, 684 S.W.3d 348. We review findings in dependency-neglect proceedings de novo. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, having considered the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.*

## II. *Elliott*

Elliott makes two arguments on appeal. First, that he was denied due process because DHS failed to secure his participation in the hearings, provide court orders, or enable him to participate in the case after release from prison. Second, he argues that grounds do not support termination of his parental rights.

Elliott argues that DHS completely failed to provide him with any meaningful participation in this case to the point that it deprived him of basic due process. DHS contends that Elliott did not preserve this argument for appeal. Elliott argues that his case is similar to *Tuck v. Arkansas Department of Human Services*, 103 Ark. App. 263, 265, 288 S.W.3d 665, 667 (2008), where this court reversed a termination of parental rights because DHS never included the appellant in any services or the case plan prior to his rights being terminated. We disagree. Elliott's case is more similar to *Sills v. Arkansas Department of Human Services*, 2018 Ark. App. 9, 538 S.W.3d 249. *Sills* also distinguishes its fact pattern from that of *Tuck*. In *Sills*, we wrote:

> While we continue to uphold the principles set forth in *Tuck*, we find the facts presented in this record are distinguishable from *Tuck*. In *Tuck*, the parent was not made a party and had no right to participate before the termination. Here, Sills was named as a party, was made aware of the DHS action, had the right to participate in the proceedings, and did participate in the first two hearings. Despite knowing of the open juvenile case, he failed to stay apprised of the progress or inquire into what was necessary to maintain his parental rights. DHS informed the court that Sills took no action to keep advised, such as phone calls, emails or letters, until he received the letter addressing the potential of termination. While Sills told the court that he did not know who to contact at DHS, this was a matter for the court's credibility determination. Ultimately, he was appointed parent counsel and appeared at the termination hearing with the benefit of counsel. Consequently, we are not convinced that Sills was denied "fundamentally fair procedures" as discussed in *Tuck*.

*Sills*, 2018 Ark. App. 9, at 12–13, 538 S.W.3d at 257.

Here, Elliott was named a party throughout the duration of the case; he was provided DNA testing while incarcerated; he was appointed an attorney at the second review hearing, almost a full year before the termination hearing took place; and he was appointed new counsel for the termination hearing at the fifteen-month review. So, as in *Sills*, we are not

8

convinced Elliott was denied the "fundamentally fair procedures" that were absent in *Tuck*. Moreover, the evidence from the termination hearing demonstrated that Elliott was offered services but that he rejected them. The court stated from the bench that it "find[s] the caseworker's testimony to be credible that [Elliott] doesn't want any services."

Elliott next argues that grounds do not support the termination of his parental rights. However, the circuit court terminated Elliott's parental rights on four independent grounds, and Elliott's counsel's brief discusses only three of those grounds. Elliott's counsel failed to explain how the aggravated-circumstances ground was unsupported. We have held that only one ground must be proved to support termination, and when, as here, an appellant fails to challenge the circuit court's independent, alternative grounds for its ruling, we will not reverse. *Schultz v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 175, at 6–7, 643 S.W.3d 856, 860.

We further note that the aggravated-circumstances ground does support termination on these facts. This ground does not require DHS to prove that meaningful services toward reunification were provided. Aggravated circumstances exist when a circuit court determines that there is little likelihood that services to the family will result in successful reunification, and here, there was credible evidence that Elliott did not want to avail himself of services. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*.

## II. *Harris*

Harris advances on appeal that the termination of her parental rights is unsupported by any grounds. She further argues that termination was not in the best interest of the children.

Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)*(a)* provides what is referred to as the "subsequent factors" ground. It allows for termination of parental rights if it is in the best interest of the child, and

> [t]hat other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factor or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

Here, subsequent to the original petition for dependency neglect, Harris was sentenced to fifty-three months' imprisonment. The children are prevented from returning to her custody while she is in prison, and there are no services identified below or to this court that are available to Harris to change that fact. The circuit court explained,

> Although Georgia Harris had substantially complied with services offered by the Department. Her actions on June 1, 2023, show that otherwise when she ingested several illicit drugs before appearing in Court for sentencing on her pending criminal charges. Such actions on her part clearly show that she failed to comply with the case plan and Orders of the Court. Her use of illegal narcotics on June 1, 2023, manifested a complete indifference to remedy her issues and to rehabilitate herself and her circumstances to resolve her criminal issues, all of which prevent the placement of the juveniles back in her custody.

Accordingly, the subsequent-factors ground is supported by substantial evidence. *See also Conway v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 30, at 7, 453 S.W.3d 703, 707

("Appellant's incarceration and lack of a viable plan upon his release were additional issues that arose subsequent to the filing of the original petition and made it not only inadvisable to place [MC] in appellant's custody but also impossible to do so.").

Georgia next argues that terminating her parental rights is not in the children's best interest. The court may determine whether it is in a juvenile's best interest to terminate parental rights by considering the juvenile's adoptability and the potential harm caused by returning the juvenile to the parent. *Johnson v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 520, 656 S.W.3d 214. Neither of these two factors is an essential element of proof in a termination case; thus, neither factor need be established by clear and convincing evidence. *Id.* Harris chooses not to challenge the circuit court's findings regarding adoptability, so we will address only the potential-harm prong of the circuit court's best-interest finding.

Harris argues that this court has demonstrated a willingness to reverse on the basis of best interest when a parent consistently complies with case plans and court orders punctuated by rare mistakes. She compares herself to parents in *Mason v. Arkansas Department of Human Services*, 2022 Ark. App. 124, 642 S.W.3d 260; *Rhine v. Arkansas Department of Human Services*, 2011 Ark. App. 649, 386 S.W.3d 577; and *Kight v. Arkansas Department of Human Services*, 87 Ark. App. 230, 189 S.W.3d 498 (2004), and she explains that she was better suited for reunification than any of the parents in those cases. None of the appellants in those cases, however, were incarcerated at the time of termination. So, despite Harris's sobriety and successful trial placement, the children could not be placed in her custody at

11

the time of the termination hearing. Accordingly, we are not willing to reverse on the basis of the precedents cited.

In considering potential harm caused by returning children to parents, the circuit court is not required to find that actual harm would result or affirmatively identify a potential harm. *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, at 12, 555 S.W.3d 915, 921. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers when he or she lacks the stability of a permanent home. *Id.* We have noted in the past that a parent's inability to demonstrate appropriate parenting and decision-making skills can support a potential-harm finding. *E.g., Martinez v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 484, at 8–9, 611 S.W.3d 225, 229–30. And we have also said that drug use in and of itself is sufficient to support the circuit court's finding of potential harm. *Hooks v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 687, at 13, 536 S.W.3d 666, 674. Harris was not able to address her legal issues during this case. Despite an offer of probation on the table at one point, she acquired an additional charge for failure to appear and then showed up at her sentencing hearing high. She was incarcerated when the termination hearing took place. We affirm the circuit court's best-interest finding.

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for separate appellant Georgia Harris.

12

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Christopher Elliott.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.