Cite as 2025 Ark. App. 587

# ARKANSAS COURT OF APPEALS
## DIVISION I
### No. CV-25-327

| | |
|---|---|
| JAKOTA WOODS | Opinion Delivered December 3, 2025 |
| APPELLANT | |
| | APPEAL FROM THE LITTLE RIVER COUNTY CIRCUIT COURT [NO. 41JV-21-46] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE BRYAN CHESSHIR, JUDGE |
| APPELLEES | |
| | AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Jakota Woods appeals the order of the Little River County Circuit Court terminating her parental rights to her two children, MC1, born on February 6, 2012; and MC2, born on June 14, 2013. Appellant argues that the circuit court erred in terminating her parental rights because the Arkansas Department of Human Services (DHS) failed to prove any of the grounds pled in the termination petition. She also contends that DHS failed to prove that termination was in the children's best interest. We affirm.

DHS received a report on June 10, 2021, that appellant and the children[1] were living in appellant's vehicle. Officer Zane Butler of the Ashdown Police Department received a

---

[1] In addition to MC1 and MC2, appellant's third child, MC3, born on November 14, 2016, was also in the vehicle.

call from a local business concerning appellant and the children sleeping in appellant's vehicle. When Butler made contact, appellant was sleeping in the front seat of the vehicle, and the children and two dogs were also inside. The vehicle was filled with trash, clothing, old food containers, and food items. Several empty alcohol containers were in the vehicle along with a pipe believed to be used to smoke marijuana, and there were also two containers believed to marijuana. Appellant denied that she and the children lived in the car and stated that she lived with her mother. However, MC1 and MC2 stated that they sometimes slept in the vehicle when their grandmother kicked them out of the house, which is what they said happened the night before. Appellant subsequently tested positive for THC, methamphetamine, and amphetamines. She admitted that she used marijuana but denied using methamphetamine. Appellant was yelling at the officers and telling them not to touch her. She was arrested for possession of drug paraphernalia, disorderly conduct, and trespassing. The children were taken into custody due to allegations of neglect and inadequate shelter.

DHS filed a petition for dependency-neglect on June 14 along with an affidavit outlining the above facts. The circuit court issued an ex parte order for emergency custody the same day. An amended petition for dependency-neglect was filed on June 15 naming Phillip Owens and Kyle Gill as the children's fathers.[2] An agreed probable-cause order was filed on June 15 whereby the parties agreed that there was probable cause for DHS to take

---

[2]An amended ex parte order for emergency custody was filed that same day.

custody of the children and for them to remain in DHS's custody. The children were adjudicated dependent-neglected in an order filed on September 14, based on neglect and parental unfitness. Specifically, the circuit court found that the allegations in the petition were true and correct and that due to appellant's drug use, she failed to provide for the health and safety needs of the children and failed to provide a safe environment that did not pose a risk to the children. It found that the fathers did not contribute to the children's dependency-neglect because they were not present at the time of the investigation. Gill was given supervised visitation with his son, MC3, and appellant was also granted supervised visitation with the children. MC1 and MC2 were in the provisional placement of a relative, and MC3 was in the provisional placement of his paternal grandmother. The goal of the case was reunification with a concurrent goal of relative placement. Appellant was ordered to submit to psychological evaluations and drug-and-alcohol assessments, successfully complete counseling and rehab if recommended, submit to random drug screens and hair-strand tests, successfully complete parenting classes, maintain regular contact with the children, successfully complete anger-management classes, notify DHS within forty-eight hours if transportation is needed, maintain housing, allow DHS access to the home, obtain employment, and cooperate with DHS.

At the review hearings held on November 16, 2021, and February 15, 2022, appellant was not in compliance with the case plan and court orders, and she was incarcerated. She was not granted visitation during this time. At the February hearing, it was noted that MC3

was in the custody of his paternal grandmother where he was to remain. The case's goal remained reunification with the concurrent goal of relative placement.

A permanency-planning hearing (PPH) took place June 10, and appellant was not in compliance and was still incarcerated. The children were ordered to remain in DHS's custody. The goal of the case was custody with a parent, guardian, or custodian.

At the August 17, 2022 fifteen-month review hearing, the circuit court found that appellant was not in compliance and was currently serving a six-month sentence. Appellant was ordered to make herself available for services while incarcerated and to contact DHS once she was released. The case's goal was relative placement following the January 12, 2023 review hearing. Appellant was to have supervised visitation with the children, and MC1 and MC2's prior provisional placement was granted weekend visitation with the children. At the March 31 review hearing, the case goal was again set as reunification with a concurrent goal of relative placement. Appellant was in compliance in that she had maintained housing and employment, had allowed DHS access to the home, had participated in family counseling, and had remained drug-free. The circuit court noted that appellant had made progress toward remedying the reasons for the children's removal and that MC1 and MC2 had been returned to appellant on a trial basis.

At the June 9, 2023 PPH, the circuit court continued the children's trial home placement with appellant, which had begun on April 28. MC3 had been returned to appellant on a trial basis on May 26. The case goal was reunification with a concurrent goal of placement with a fit parent. The circuit court found that appellant was in compliance in

4

that she had consistently remained drug-free, was employed, had appropriate housing, and was participating in counseling and ensuring her children also attended counseling sessions. It found that appellant had demonstrated progress toward remedying the reasons for the children's removal.

A review hearing took place on September 22. In the agreed order filed on October 18, the circuit court found that safety concerns prevented that children from being returned to appellant's custody due to a new report of abuse and neglect of the children during the trial home placement. However, the children were to remain with appellant on a trial basis because, other than the new report of possible neglect, the trial placement had gone well. At the December 1 review hearing, the circuit court ended the trial placement. The circuit court found that appellant consistently had no food in her home and refused to adequately feed the children. The circuit court found there were safety concerns that prevented the children from being returned to appellant: appellant's instability, drug and/or alcohol abuse, and mental-health issues that seriously affected her ability to care for, provide for, or protect the children. The court found that appellant had regressed, and she was not in compliance. The order filed on December 13 stated in pertinent part:

> The [appellant] HAS NOT complied with the case plan and the orders of the Court. While [appellant] testified she is working and taking care of the juveniles, they are not being fed regularly, or being consistently cared for by [appellant]. [Appellant] complied with the case plan and the orders of the Court up until August 2023. She had remained consistently drug free, was employed, had appropriate housing, was participating in counseling and was ensuring her children attended counseling sessions. Therefore, the [children] were placed on a trial home placement with [appellant]. The trial home visit did not go well as the [children] repeatedly reported to school officials they were hungry and [appellant] testified her priority was helping

5

her boyfriend of four (4) months recover from a broken ankle, rather than working. While [appellant] has maintained housing, there has been no evidence presented that she has maintained employment as the last time [she] provided any proof of employment to [DHS] was August 2023. [MC1 and MC2] have not been living with [appellant] while on the trial home visit, but have been living with cousin Breanna Parker. When [DHS] went to do home visits at the [appellant's] home on more than three (3) occasions in October and November 2023, the [appellant] had no food in her home, but did have an abundance of alcohol in the refrigerator. In September 2023, [DHS] paid for groceries, but the [appellant] testified the children just "wasted" food when she bought it. While the [appellant] testified she was prohibited from consuming alcohol as one (1) of the conditions of her parole, it concerns the Court that [she] has no food but does have alcohol in her home despite repeated attempts by [DHS] to assist [her]. The last two (2) drug screens performed by [DHS] appeared to be altered in some unknown way, with one not registering a temperature and one appearing to have black specks in the sample. [Appellant] has allowed [DHS] access to the home (when she is there) and has successfully completed parenting classes.

Appellant was ordered to submit to a body hair-follicle drug screen, and DHS was ordered to make the referral within five days.

A review hearing took place on February 2, 2024. The circuit court found that MC1 and MC2 were placed with their cousin and that MC3 was still in his grandmother's custody. The case goal was reunification with a concurrent goal of relative placement. Appellant was found to be in partial compliance in that she had not allowed DHS access to the home; had not made any progress in parenting as MC3 went to school in December 2023 reporting he was hungry, and while DHS did provide food in December, it had not been able to access the inside of the home in January to verify whether the home was safe and appropriate; when DHS attempted home visits in January 2024, there were trash cans overflowing with beer cans outside the home; although appellant had indicated she has employment, she had not provided proof of such; appellant was inconsistent in submitting to urine drug screens or

6

staying in contact with her assigned caseworkers; and appellant's hair-follicle screen was positive for THC, and she admitted taking an edible because she was overwhelmed. The circuit court found that appellant had not demonstrated progress toward the goal of the case, and for the last four months, she had not remedied the issues that prevented the safe return of the children. Appellant was ordered to successfully complete an inpatient drug-rehabilitation program that lasted at least six months.

The circuit court found that appellant's continued drug use, lack of stable housing, and lack of employment prevented the children from being placed with her at the April 5 review hearing. The case goal was changed to subsidized guardianship with Parker for MC1 and MC2 and unsubsidized guardianship with paternal grandmother Teri Clements[3] for MC3. The circuit court noted that appellant had been repeatedly late picking up or dropping off the children for her unsupervised visits. The circuit court found that appellant had a continuous pattern of dishonesty throughout the history of the case. Appellant was ordered to maintain housing and employment, allow DHS access to the home, submit to random drug screens, remain drug-free, and continue to cooperate with DHS.

DHS filed a petition and an amended petition in May seeking the appointment of Clements as MC3's guardian. A hearing was held on the motion on July 26. The circuit court granted the motion and closed the case as it related to MC3 in an order filed on September 9.

---

[3]The order listed Manasco as Teri's last name, but in every other document, Clements is listed as Teri's last name.

A review hearing took place on August 26. The circuit court found that the children still could not be returned to appellant's custody. The case goal was subsidized guardianship with Parker. The circuit court noted that appellant's visitation had been sporadic, she was late either picking up or dropping off the children, she had not made herself available for home visits in her new residence, she had not made herself available for the services referred by DHS, she continued to make false and misleading statements to the circuit court, she had not complied with the case plan and orders of the court, and she had not made significant and measurable progress toward remedying the issues that prevent the safe return of the children. She was again ordered to maintain housing and employment, allow DHS access to the home, submit to random drug screens, remain drug-free, and continue to cooperate with DHS.

The goal of the case was changed to adoption with a concurrent goal of relative placement at the October 11 review hearing. By this time, appellant was having supervised visits with the children, and they seemed to be going well. Appellant suffered the same shortcomings when it came to the case plan as was noted at other review hearings. She was ordered to maintain housing and employment, allow DHS access to the home, submit to random drug screens, remain drug-free, and continue to cooperate with DHS.

DHS filed a petition to terminate appellant's parental rights on November 19, 2024.[4] It alleged several grounds for termination: (1) twelve-months' failure to remedy;[5] (2) subsequent other factors;[6] and (3) aggravated circumstances.[7] Appellant filed a response to DHS's petition on November 22 contending that there were no grounds for the termination of her parental rights and asking the circuit court to dismiss the petition.

The termination hearing took place on February 21, 2025, after being continued due to inclement weather. Camille Lamon testified for DHS. She stated that the children were removed from Parker's custody due to allegations of sexual abuse by Parker's "significant other that was in the home." She testified that there were no other viable relatives at that time to consider for guardianship. She said that DHS decided to move on with termination of parental rights when reunification with a relative was no longer an option. She stated that appellant participates in counseling through Harbor House, had completed the parenting program, had provided DHS with job verification, and has had stable housing since October. However, she stated that appellant had not provided proof that she had completed the inpatient six-month rehabilitation program. She said that appellant had provided paystubs for the months of January and February from Journeys and from a local hotel. She testified

---

[4]The petition was also against Owens, but his rights were not terminated because his case was continued.

[5]Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2023).

[6]Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*.

[7]Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)*.

that appellant had lived at approximately six addresses since the case opened. She said that appellant provided DHS with her current address, 711 East Locke in Ashdown, in October 2024.

Lamon testified that DHS had been able to assess the home only twice[8] since appellant had lived there, even though DHS visited the home biweekly. However, she did state that appellant informed DHS that she works most of the time and was available only on Wednesdays, which is the day appellant exercises family time. Lamon stated that pictures were taken of appellant's refrigerator, freezer, and cabinets during the two visits, and those pictures reflected that appellant still had a lack of food in her home. She said that this is a problem because lack of food is one of the reasons the children were removed from appellant during the trial home placement. She stated that appellant's visitations with the children usually go well, but their relationship is more akin to a friendship rather than a parent and child relationship. Lamon admitted that appellant was able to give both children adequate time during the visits. She stated that the children are currently in separate foster homes, but they attend the same school. She opined that appellant had not remedied the conditions that caused removal because lack of food was still a concern, and DHS was unable to perform random drug screens because the caseworker could not reach appellant at random times. Lamon testified that there are not any other services DHS could provide to appellant to remedy the conditions of removal that appellant has not already been offered. She stated

---

[8]October 23, 2024, and January 8, 2025.

that appellant's parental rights should be terminated because the children need permanency. She said that returning the children to appellant could potentially be harmful because of the lack of food and appellant's failure to complete the inpatient treatment as ordered.

On cross-examination, Lamon admitted that the pictures were taken when the children were not at the home. She agreed that the children are not allowed to visit appellant or spend any time at the home. She stated that appellant had completed all the services except the inpatient treatment and the random drug screens. On cross-examination by the ad litem, Lamon stated that appellant's two drug screens before the children's removal from her home during the trial placement appeared altered in that they either had no temperature or were clear. She said that is why DHS requested a hair-follicle test.

Ruth Ann Murphy testified that she is a DHS adoption specialist. She stated that the children are adoptable and that there are no known factors that would prohibit adoption. She said that there were sixty potential matches if the children were placed together. She also said that the children's current placements are interested in potentially adopting them. Murphy agreed on cross-examination that if the children were adopted by their current placements, they would be in two separate homes.

Appellant testified that she has lived in her current home since October 2024 and that she signed a twelve-month lease at that time. She stated that she currently works at Candlewood Suites and Holiday Inn Express in Texarkana and that she began the job at Candlewood in November. She said that she began working at Journeys Kidz in June but

had recently quit to focus on her schoolwork.[9]  She testified that her home lacked food during the two visits because she only has to feed herself and that she usually just eats at work or fixes lunch and takes it to work with her.  She said that she has been in counseling since January 30, 2024, and that it is going well.  Appellant introduced a hair-follicle test that she had done on her own on February 14, 2025, showing that she tested negative for drugs.  She stated that she had not completed the six-month inpatient treatment because she could not find one, and she did not have any help from DHS with referrals.  She said that she found a thirty-day treatment program but was told by DHS that it did not qualify.  She also said that she cannot afford a six-month inpatient treatment program.  Appellant testified that her parental rights should not be terminated because she loves her children, and they belong with her, not in a foster home or placed for adoption.

On cross-examination, appellant admitted that she had not gone to the court-ordered inpatient treatment.  She testified that her home was ready for the children to be returned that day.  She stated that DHS did not visit her home weekly and that every time they showed up, she allowed them inside.  On cross-examination by the ad litem, appellant testified that she was not sure why the children were removed from her custody the first time.  She talked about the numerous jobs she has had throughout the case and stated that she still cleans houses on the side.  She did not have proof of income for the house-cleaning job because

_____

[9]She said that she is getting an associate degree online in allied health and science at South University.  She began an eighteen-month program in November 2024 and wants to become an x-ray technician.

she is paid in cash. The court asked appellant how many times she had told the court that she quit her job to focus on school, and appellant replied, "Only twice." Appellant made the same statement to the court in December 2023, and she had not been enrolled in school.

DHS asked the circuit court to grant its petition because if the children were returned to appellant, they would be returning to the same conditions that caused their removal in 2021. The ad litem agreed that appellant's parental rights should be terminated because the children need permanency. Appellant's attorney stated that appellant had done everything asked of her except go to inpatient treatment and asked that the petition be denied and appellant be reunited with her children.

The circuit court said that appellant had almost zero credibility with it. The circuit court terminated appellant's parental rights and stated that it was in the best interest of the children. The March 24 termination order terminated appellant's parental rights on two grounds: twelve-months' failure to remedy and aggravated circumstances. The circuit court found that the children are adoptable and that they would face potential harm if placed back in appellant's custody. Appellant timely appealed.

Appellant argues that the circuit court erred in terminating her parental rights because the evidence did not support the statutory grounds for termination or that termination was in the children's best interest. Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best

interest of the child.[10]  The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the child will be adopted and of the potential harm caused by returning custody of the child to the parent.[11]  Statutory grounds and a best-interest finding must be proved by clear and convincing evidence, which is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established.[12]  We review termination-of-parental-rights cases de novo.[13]  The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[14]  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[15]

The purpose of the termination-of-parental-rights statute is to provide permanency in a child's life in all instances in which the return of the child to the family home is contrary to the child's health, safety, or welfare, and it appears from the evidence that a return to the

---

[10]*Smith v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 470, 610 S.W.3d 161.

[11]*Id.*

[12]*Id.*

[13]*Id.*

[14]*Id.*

[15]*Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007).

family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[16] Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.[17] Proof of only one statutory ground is sufficient to terminate parental rights.[18]

One ground relied on by the circuit court when terminating appellant's parental rights was the aggravated-circumstances ground, which requires proof that a juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, or sexually abused; or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification.[19] It is clear from the facts of this case that no abuse, abandonment, or cruelty was alleged against appellant. Thus, DHS had to prove that there was little likelihood that services to the family would result in successful reunification. Appellant maintains that reunification services were successful and that at the time of the termination hearing, she was in a position where reunification could be achieved. However, Lamon testified that there were not any services DHS could offer appellant that had not already been offered that would help remedy the conditions that caused removal. A caseworker's testimony that there are no further services that DHS can provide to reunify a

---

[16]Ark. Code Ann. § 9-27-341(a)(3).

[17]*Shaffer v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 208, 489 S.W.3d 182.

[18]*Burks v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 309, 634 S.W.3d 527.

[19]Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)*.

15

parent with his or her child supports a finding of aggravated circumstances in a termination-of-parental-rights proceeding.[20] Moreover, the evidence showed that appellant did not attend inpatient treatment as ordered, and DHS was not able to perform random drug screens. Appellant could not even verbalize what caused the children's initial removal from her custody, and she still did not understand the importance of maintaining food in her home. Appellant regressed from a trial home placement to having only supervised visits with the children at a location outside of appellant's home. Food security was, and continued to be, an issue with appellant, despite services. Additionally, appellant moved often and had been at her current residence for only a few months, and the same was true of her employment. Therefore, the circuit court did not err in finding that aggravated circumstances supported the termination of appellant's parental rights.

Next, appellant argues that the circuit court erred in finding that termination of her parental rights was in the children's best interest. Specifically, she contends that she remedied the issues that caused the children's removal and was sober and able to safely parent her children. Appellant does not challenge the circuit court's finding that the children are adoptable; therefore, it is waived on appeal.[21] For potential harm, the evidence must be viewed in a forward-looking manner and considered in broad terms; however, a circuit court is not required to find that actual harm will result or to affirmatively identify a

---

[20]*Myers v. Ark Dep't of Hum. Servs.*, 2023 Ark. App. 46, 660 S.W.3d 357.

[21]*Black v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 518, 565 S.W.3d 518.

16

potential harm.[22] Additionally, past behavior may be viewed as a predictor of potential harm.[23] Further, the same evidence relied on to support statutory grounds may be used to support potential harm.[24]

Appellant argues that this case is similar to three cornerstone cases in which this court reversed the circuit court's termination of parental rights because there was insufficient evidence of potential harm: *Rhine v. Arkansas Department of Human Services*.[25] (law does not require "flawless compliance" with court orders or "perfect parent[ing]," and finding no evidence of harm or "real risk" of potential harm); *Cranford v. Arkansas Department of Human. Services*[26] (best-interest finding clearly erroneous where no evidence that parents had ever physically abused or harmed child or were a threat to do so in the future); and *Kight v. Arkansas Department of Human Services*[27] (reversing termination order where mother had remained sober for six months prior to termination despite few lapses in judgment, such as fraternizing with drug-abusing/criminal father of children and relapse during case while pregnant). These cases are distinguishable from the instant case because the issues with

---

[22]*Phillips v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 169, 596 S.W.3d 91.

[23]*Id.*

[24]*Id.*

[25]2011 Ark. App. 649, at 10–11, 386 S.W.3d 577, 583.

[26]2011 Ark. App. 211, 378 S.W.3d 851.

[27]87 Ark. App. 230, 189 S.W.3d 498 (2004).

17

appellant remained the same throughout the history of the case. She made some progress, but the children were removed a second time due to food insecurity and appellant's altered drug screens. There never was a time after removal that appellant was granted overnight visits, and at the time of the termination hearing, the children were not even allowed to have visits at appellant's home. Appellant changed homes and employment often, so she did not have a stable home, and her work history was spotty at best. Although there were concerns with appellant's drug usage, she was never available for random drug screens, and she did not attend the court-ordered inpatient treatment. Under these facts, we cannot say that the circuit court's finding that the children would be subjected to potential harm if they were returned to appellant was clearly erroneous. Accordingly, we affirm.

To the extent that appellant's argument is a request for us to reweigh the evidence in her favor, it is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court.[28]

Affirmed.

TUCKER and WOOD, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.

---

[28]*Fulmer v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 56, 660 S.W.3d 347.