Cite as 2026 Ark. App. 354

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-25-536

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF MC, A MINOR | Opinion Delivered May 20, 2026 |
| EMILY WALLACE | APPEAL FROM THE PIKE COUNTY CIRCUIT COURT |
| APPELLANT | [NO. 55JV-23-9] |
| V. | HONORABLE BRYAN CHESSHIR, JUDGE |
| AARON CROW | |
| APPELLEE | AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Emily Wallace appeals the order of the Pike County Circuit Court denying her petition for guardianship of her niece, MC,[1] and granting appellee Aaron Crow's guardianship petition and closing the dependency-neglect case. Appellant argues that the circuit court erred in finding that placement with appellant was not in MC's best interest. We affirm.

The Arkansas Department of Human Services (DHS) removed MC from the custody of her parents, Autumn Self and Shane Wallace, on March 27, 2023.[2] DHS filed a petition

---

[1]DOB January 19, 2023.

[2]MC was removed due to conditions of the caregiver presenting immediate danger to MC's health and wellbeing: the physical living conditions were hazardous and threatening to MC's health; and the caregiver's substance abuse seriously impaired her ability to

for dependency-neglect the following day, and the circuit court entered an ex parte order for emergency custody on March 29. On April 20, appellant filed a motion for immediate temporary and permanent custody, a request for expedited approval under the Interstate Compact on the Placement of Children (ICPC),[3] and a motion to intervene. That same day, the circuit court entered an agreed probable-cause order finding that probable cause existed and continued to exist and that it was in MC's best interest to remain in DHS's custody. DHS filed a response to appellant's motion on May 2 objecting to appellant's motion for custody and expedited ICPC. DHS stated it was "pursuing a goal of reunification with the mother and father and, at this point, the parents are cooperating with the Department and working toward remedying the issues that caused removal." DHS also noted that it was following its own policy and was already in the process of submitting an ICPC on appropriate family members. DHS asserted that it did not believe appellant was the most fit relative to take custody of MC and demanded strict proof. DHS further responded to the motion to intervene, stating that certain individuals "shall not be made parties to the proceeding when reunification remains the goal of the case" and reaffirmed that reunification was the current goal.

---

supervise, protect, and care for MC. Domestic violence was also an issue and posed an immediate danger of serious physical and/or emotional harm to MC. The parents also had a history of "couch surfing" and residing in homes were drug use is prevalent. Wallace was in jail at the time of MC's removal. MC was subsequently placed in foster care with appellee and his now fiancée, Sasha.

[3]Appellant is Wallace's sister and lives in Indiana.

MC was adjudicated dependent-neglected due to parental unfitness and neglect in an agreed order filed on May 6.  In the review order filed on September 4, the case goal was changed to reunification with a concurrent goal of relative placement.  In the permanency-planning order entered on March 14, 2024, the circuit court changed the goal to placement of MC with a parent, guardian, or custodian.

On June 7, appellee filed a motion to intervene and attached a petition for appointment of continuing guardianship of the person of MC.  Both appellant and DHS filed responses on June 12 asking the circuit court to deny the motion.  DHS stated that it intended to seek a change of the case goal back to reunification with a concurrent goal of relative placement.  DHS also noted that authorizing a plan to obtain a guardianship with a fit and willing relative was preferred over authorizing a plan to obtain a nonrelative guardian for MC.  The circuit court granted appellee's motion to intervene on June 18.  Appellant filed a verified petition for permanent guardianship on June 26.  Appellee filed a petition for appointment of continuing guardian of the person for MC on July 8.

 A fifteen-month review hearing was held on June 14.  In the order filed on July 17, the circuit court changed the case goal to guardianship.  Both appellant and appellee were added to the case as intervenors.

The circuit court held a hearing on the competing guardianship petitions on August 9, 2024.  Hannah Snowden, the caseworker, testified that DHS was recommending that appellant be granted guardianship over MC because she is MC's paternal aunt.  On cross-examination by the attorney ad litem, Snowden stated that MC was able to enjoy visitation

with her parents while living with appellee. When cross-examined by appellant's attorney, Snowden testified that she had spoken with appellant, and appellant had stated that she had no objection to allowing Self and Wallace to visit MC. Snowden acknowledged on cross-examination by Wallace's attorney that moving MC Indiana would make it more difficult for her parents to maintain contact with her—at least for in-person visitation—because they planned to remain in Arkansas. When the circuit court asked Snowden her personal opinion, Snowden stated that she believed appellee should receive guardianship because the parents could more easily maintain their relationship with MC. However, she also testified that because appellant's ICPC had been approved, she believed DHS was required to place MC with appellant.

Leah Thomas, Snowden's supervisor, testified that because the ICPC had been approved, there had to be good cause to place MC somewhere other than with appellant. She stated that appellant had said she would allow and encourage a relationship between MC and her parents. Thomas testified that under these circumstances, she could not "find good cause that would override a very, very overwhelming positive approval for the placement [with appellant]." On cross-examination by appellee's attorney, Thomas stated that appellant and her domestic partner did not object to the placement itself but were concerned that "if the parents continue to use methamphetamines or any other drugs and had an ongoing relationship with [MC] while placed in their home, that would be disruptive and be problematic[.]" She reiterated that their reservations related to the parents' ongoing substance abuse, not to MC's being placed with them in Indiana. She also testified that

4

appellant's partner expressed concerns that Wallace would visit MC in their home under the influence. Thomas further testified on cross-examination by appellant's attorney that the ICPC home study stated that appellant's partner had reservations about MC's being placed with them and the placement potentially becoming permanent; however, both he and appellant were prepared to welcome MC into their home. The ICPC home study also stated that they were motivated and capable of providing for MC with a safe, secure environment and a strong support system. Thomas said that in follow-up staffings, the partner clarified that he wanted to welcome MC into their home. She explained that DHS policy gives preference to a family members but that the child's best interest must also be considered. She said that all factors formed the basis for her opinion. When cross-examined by Self's attorney, Thomas testified that appellant had weekly supervised visitation with MC via Zoom and had a lengthy in-person visit with MC the last court hearing. On cross-examination by the ad litem, Thomas stated that there were four children in appellant's home and that appellant was currently pregnant. On recross-examination by appellant's attorney, Thomas testified that she believed the ICPC home study showed that MC would have her own room.

DeeDee McCauley, MC's CASA, testified at the circuit court's request that it was in MC's best interest to remain in appellee's home. She stated that the foster parents had gone above and beyond to maintain MC's relationship with her parents during the sixteen months MC had been placed with them. She said that MC knows her parents and appears happy with them in the photographs she has seen. When questioned by appellee's attorney, McCauley stated that MC's placement in appellee's home has been successful, MC is thriving

5

there, and all her educational and developmental needs were being met. She opined that MC has a healthy bond with her parents. She also testified that MC has two half siblings in Murfreesboro and that appellee has included them in activities because appellee wants to ensure that MC knows her family. McCauley said that appellee has also facilitated a relationship between MC and her maternal grandmother and aunts. She stated that the foster parents had exceeded her expectations with MC and that she has no concern about MC's continued placement in their home. On cross-examination by appellant's attorney, McCauley testified that she had observed MC with her foster parents at least once a month— a total of twelve to sixteen times. She said that she had observed appellant with MC only once, after the last court hearing. She admitted that a single visit could not form the basis for her opinion concerning MC's best interest. On cross-examination by the ad litem, McCauley testified that MC has her own room at appellee's home, and no other children live there. She noted, however, that appellee has a large close-knit extended family. She stated that MC was still able to have contact with her biological siblings while in foster care. She opined that it was in MC's best interest to maintain a relationship with her parents, especially with Self, who had made progress by maintaining steady employment for several months and securing her own housing.

Wallace testified that the foster parents had done a great deal for MC, including ensuring that she was able to see both him and Self. He stated that if MC was placed in Indiana, visitation would feel as though he were was back in prison because he would be able to visit her only through technology—similar to visiting in prison—and would not be able to

be involved in her life. He said that he could not travel to Indiana to visit MC. He admitted that he had not properly sought the help he needed. On cross-examination by appellant's attorney, Wallace testified that he currently works at Dairy Queen in Hot Springs. He said that he could not move back to Indiana because he is an inactive gang member and does not want to return there. He also said that he is not close with his family in Indiana and admitted that he claimed he would move back to Indiana only to hurt Self. Wallace told the circuit court that he still believes it is in MC's best interest to be around him despite the "conditions" he had been in recently. He said there were times when appellee had talked him through some "bad mindsets" and that appellee cared so much about MC that he also cared about what happened to him and Self. Wallace stated that he would never be able to be a parent and that he was willing to walk away and never see MC again if he could not get his life together. On cross-examination by appellee's attorney, Wallace testified that he intended to remain in Arkansas because he has nowhere to go in Indiana.

Self testified that it was important to appellee that she be able to enjoy visits with MC. She stated that she intended to remain in Arkansas and did not plan to go to Indiana. She said she currently lives about thirty minutes from MC. On cross-examination by her attorney, Self stated that she had executed a consent and wanted MC to remain with appellee. She said MC knows who she and Wallace are and that she visits MC regularly. She stated that she would be in a better position to maintain her relationship with MC if MC remained in appellee's home. She also said it was her intention to continue improving so she could regain custody of MC. On cross-examination by the attorney ad litem, Self

7

testified that she and Wallace have not maintained contact with Wallace's family since leaving Indiana and that there was nothing in place for her or Wallace to maintain phone contact or to have a close relationship with appellant or any of Wallace's other family members.

Appellee testified that he is a chicken farmer, owns a logging business, and makes over $250,000 a year. He stated that he is not a felon and is not the legal guardian of anyone else. He testified that he has been MC's foster parent since her removal and that the experience has been great overall, although it was difficult at first because MC could not keep milk down. He said there had been no issues with CASA and that he viewed CASA as an asset in the process. Appellee opined that MC loves her parents, especially Wallace. He stated that he has seen improvement in Self, that MC calls her "momma," and that MC goes to her. He testified that it is important for MC to have a relationship with her parents and that if MC remained in Arkansas, Self would have a fair opportunity to see her and build that relationship. He stated that Self has maintained her own housing and employment for six months and has been clean for four or five months. Appellee testified that he wanted guardianship of MC and understood that it could later be dissolved if the parents improved their circumstances. He stated that Wallace and Self had asked him to be MC's guardian, and he agreed because he loves MC. He said that he believed the parents could achieve reunification while he served as MC's guardian. He testified that he did not believe Wallace and Self would get the same personal interactions with MC or be able to watch her grow up if she were placed in Indiana. Appellee stated that MC had contact with her siblings and

8

that he wanted those relationships to continue. He testified that he loves MC and that she means everything to him. He said he believed that even if MC's parents regained custody, he and Sasha would still be able to be part of MC's life. He stated that he is willing to do anything for MC and has all the time in the world to devote to her. He testified that MC is stable and that he knows he can keep her stable. He told the circuit court that he and Sasha had lived together for eleven years.

Appellant testified that she lives approximately ten hours away. She stated she had been monitoring the case for quite some time and that MC is her niece. She testified that she is not a convicted felon, has no criminal history, and is financially stable. She said there was no reason that she would be unable to take care of MC and that MC would have her own room at her house. Appellant stated that she wants to be MC's guardian and understands that the guardianship could end if the circuit court later determined that MC's parents were able to regain custody. She testified that she wanted guardianship so that MC could grow up knowing her family because they had not been allowed much contact with her. She said that she is comfortable with Wallace and Self having visitation and contact with MC if MC were placed with her, and she would not object to the foster parents checking in on MC. She acknowledged that she had nothing negative to say about MC's foster parents. Appellant told the circuit court that her sons are twelve, six, four, and two and that she is pregnant with a girl. She stated that her six-year-old is excited to get to know MC and accompanied her to the last visit. She stated that they live in the country and that her soon-to-be in-laws live right next door. She testified that her boyfriend, Tyler Denu, is a heavy-

diesel mechanic who runs his own company and that they have been together almost nine years. She stated that most of her family lives in Indiana and that Denu's family lives nearby as well. She testified that she is a fractional nurse. She explained that she and Wallace lost contact when he went to live with their father and she stayed with their grandmother. She stated that she was one of the people who reported Wallace and Self to DHS and that she tried to get MC at that time, but she could not because she did not live in Arkansas. On cross-examination by the ad litem, appellant testified that she would do whatever DHS required to facilitate visits between MC and her parents, including using FaceTime or Zoom. She said she would not have a problem traveling to Arkansas during breaks or in the summer. She acknowledged that if she obtained guardianship, DHS would not be regulating or facilitating visitation, but she would still be willing to facilitate visits and work with Wallace and Self. She testified that she had tried to come up with a plan to get MC before she was removed from her parents' custody.

Denu told the circuit court that he had owned his business for almost two years. He stated that his parents live about four hundred yards away and are involved with their four children. He testified that he has no reservations about MC's being placed in their home, but he did have reservations about her parents and their conduct. He said that he did not want the behavior Wallace and Self had displayed in the past around his children or in his home.

The circuit court stated that since this was not a termination-of-parental-rights case, it was in MC's best interest to remain in Arkansas so that reunification with her family would

10

be more feasible. The circuit court noted that although Wallace was not headed in a good direction, Self was, and the circuit court wanted to give her that opportunity. The circuit court granted appellee's petition for guardianship to allow Self a chance at reunification. Afte the circuit court announced its decision, appellant's counsel objected, arguing that *Ellis v. Arkansas Department of Human Services*,[4] stands for the proposition that that statutory family preference is the policy of both the State and DHS. The circuit court stated that it understood and noted the objection for the record. The circuit court explained that one reason it granted guardianship to appellee is to allow the parent who still has a chance of regaining custody to have access to in-person visitation "instead of strictly by tele or on the phone." Self's and Wallace's entries of appearances, waivers, and consents to guardianship by appellee were executed on August 9 and filed on August 12.

The circuit court entered a final order appointing appellee guardian over the person and estate of MC on June 13, 2025. The order stated that it had considered and denied appellant's petition. An order closing the case was filed on June 18. Appellant filed a timely notice of appeal on June 30.

In dependency-neglect cases, the standard of review on appeal is de novo, but the appellate court will not reverse the circuit court's findings unless they are clearly erroneous.[5] A finding is clearly erroneous when, although there is evidence to support it, the reviewing

---

[4] 2016 Ark. 441, 505 S.W.3d 678.

[5] *Pineda-Garcia v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 33.

11

court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[6] We defer to the circuit court's evaluation of the credibility of the witnesses.[7]

Appellant argues that the circuit court erred in finding that placement with her was not in MC's best interest. She contends that she was entitled to the statutory family preference and that the circuit court's failure to consider that preference contravenes the holding in *Ellis*.[8] In *Ellis*, the father appealed a permanency-planning order that denied his motion to consider placement of his child in the home of his brother, the child's uncle.[9] The circuit court did not conduct the mandatory six-month review hearings under Arkansas Code Annotated section 9-27-337 and refused to consider the uncle's satisfactory home study, despite DHS's recommendation that the child be placed with the uncle.[10] Instead, the circuit court ordered that the child remain in his foster home and changed the goal of the case to adoption.[11] On appeal, the father asserted that the circuit court's refusal to place the child with the uncle violated the State's public policy to preserve and strengthen the juvenile's family ties when it is in the best interest of the child.[12] Our supreme court agreed

---

[6]*Id.*

[7]*Id.*

[8]*Supra.*
[9]*Id.*

[10]*Id.*

[11]*Id.*

[12]*Id.*

with the father and held that the circuit court erred by not considering the home study and by not applying the statutory preference for relative placement upon receipt of the satisfactory relative home study.[13]

This case is distinguishable from *Ellis*. In this case, the circuit court did consider appellant's ICPC home study and noted that if this were a termination-of-parental-rights case, it would grant appellant's petition. However, the circuit court found that since this was a guardianship case and no one was seeking to terminate the parents' parental rights, it was in the best interest of MC to remain in Arkansas so that there could be a real possibility of her reuniting with Self. The circuit court found that in-person visitation would help facilitate MC's chances of being returned to Self. Although DHS recommended that appellant be granted guardianship over MC, everyone else disagreed with DHS's position. Appellant argues that the circuit court did not consider the statutory relative placement; however, the facts of this case show that the circuit court did consider the statutory preference but that the best interest of MC overrode that preference. Under these facts, we cannot say that the circuit court's findings were clearly erroneous. Accordingly, we affirm.

To the extent that appellant's appeal is nothing more than a request for us to reweigh the evidence in her favor, it is well settled that we will not reweigh the evidence on appeal.[14]

Affirmed.

---

[13]*Id.*

[14]*See Woods v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 587, 725 S.W.3d 883.

13

ABRAMSON and MURPHY, JJ., agree.

*Kevin L. Hickey* and *Michael Graugnard*, for appellant.

*Robert S. Tschiemer* and *Blake H. Crawford*, for appellee.